[No. S004765. Crim. No. 26405. Dec. 14, 1992.]

THE PEOPLE, Plaintiff and Respondent, v.
ALFRED ARTHUR SANDOVAL, Defendant and Appellant.

158

## COUNSEL

Eric S. Multhaup, under appointment by the Supreme Court, and Kathy M. Chavez for Defendant and Appellant.

David Booth Beers and John Townsend Rich as Amici Curiae on behalf of Defendant and Appellant.

John K. Van de Kamp and Daniel E. Lungren, Attorneys General, Richard B. Iglehart and George Williamson, Chief Assistant Attorneys General, Edward T. Fogel, Jr., Assistant Attorney General, Carol Wendelin Pollack, Acting Assistant Attorney General, Marc E. Turchin, William T. Harter, Susan Lee Frierson and Sharon Wooden Richard, Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**PANELLI, J.**—Defendant was convicted by a jury in the Los Angeles County Superior Court of four counts of first degree murder (Pen. Code,

§ 187)[1] with a multiple-murder special-circumstance finding (§ 190.2, subd. (a)(3)), and one count of attempted murder (§§ 664/187). The jury also found that defendant personally used a firearm in the commission of each offense (§ 12022.5).

The jury returned a verdict of death as to the conviction of murder of Marlene Wells and verdicts of life without possibility of parole as to the convictions of murder of Gilbert Martinez, Anthony Aceves, and Ray Wells. The appeal is automatic. (§ 1239, subd. (b).)

GUILT PHASE FACTS

*Prosecution Case.*

1. *Belvedere Park Murders.*

About 2:30 a.m. on October 14, 1984, Adela Rodriguez and a group of girls (Zebba, Susie, Dianne, Corine, and Yvonne), along with Gilbert Martinez and Manuel Torres, drove to Belvedere Park in East Los Angeles. Anthony Aceves and a man named Jack drove to the park in another car. Once there, the group broke up into couples. Adela walked off with Gilbert Martinez.

Adela and Gilbert started walking back to the car after Zebba called for them to return. A fight was about to start near the car between people Adela did not know. As Adela was getting in the car, Gilbert said, "Let me get my friends first." As Gilbert approached his friends, Adela saw defendant shoot Gilbert in the head at close range. Defendant also shot Anthony in the head, and he shot at Manuel as the latter ran away. Defendant turned and pointed the gun at Adela and her friend Susie. Susie backed the car out, and drove off. Defendant's car followed them for a short distance. The girls then returned to the park to check on their friends. Gilbert died in Adela's arms.

Susie Martinez testified that she drove Adela and the others to Belvedere Park on October 14, 1984. She walked around the park with Anthony Aceves until they were called back to the car. When they arrived at the car, she saw Carlos Tostado fighting with someone. The fight stopped, and she noticed defendant standing next to a brown Monte Carlo arguing or talking with Anthony. Gilbert was nearby. Defendant pulled out a gun and shot Gilbert and Anthony in the head. After Gilbert fell to the ground, defendant shot him again. Susie did not see Gilbert or Anthony with any weapons, nor did she them make any aggressive gestures.

---

[1] All statutory references hereafter are to the Penal Code unless otherwise indicated.

Carlos Tostado testified that he drove a white Monte Carlo to Belvedere Park on October 14, 1984. Several friends were with him. Another car drove up with four young women and three men. Tostado fought with one of the men. As the fight was breaking up, defendant, also known as "Chato," and Eugene Valenzuela, also known as "Pelon," drove up in a tan Monte Carlo. Defendant got out of the car, grabbed one of the men by the neck and shot him. Tostado had known defendant for about 10 years and was a member of the same gang, Arizona Marivilla. The victims belonged to a different gang, Mariana Marivilla.

Tostado admitted that he had lied to the police when he gave them statements on October 14, October 16, and December 12, 1984. He acknowledged that he was on probation for using phencyclidine (PCP) at the time of his testimony.

The prosecution read the preliminary hearing testimony of Manuel Torres, who had since died in an unrelated auto accident. He had gone to Belvedere Park in Susie's car with Gilbert Martinez and several young women. As they were getting into the car to leave, Gilbert stopped to talk to a group of people. Anthony Aceves left the car to "back up" Gilbert. Torres heard shots and saw Anthony fall to the ground. He himself was shot in the neck, but he did not see who shot him.

Deputy Sheriff Woodrow West went to Belvedere Park around 4 a.m. to investigate the shootings. He found a small pocket knife on the ground near the spot where Anthony Aceves had fallen. There were traces of blood on the knife. Deputy West also found five expended .22-caliber bullet casings.

Autopsies performed on the bodies of Gilbert Martinez and Anthony Aceves revealed that both alcohol (.09 percent) and PCP (.033 micrograms per milliliter) were found in Martinez's blood and that PCP (.042 micrograms per milliliter) was detected in Aceves's liver tissue. Since Aceves died three days after the shooting, the PCP levels in his liver and blood would have been higher at the time of the shooting.

2. *Wells Murders.*

Benjamin Verduzco had known defendant for about 16 years and had been a fellow member of Arizona Marivilla, but Verduzco no longer belonged. He agreed to testify in exchange for release from prison. He was placed in a protection program, given $600 a month for room and board, and was promised a name change.

On October 15 or 16, 1984, defendant asked Verduzco to keep a beige and brown Monte Carlo in his garage because he was in some kind of trouble.

Verduzco agreed. Defendant left the car in Verduzco's garage and drove off with Eugene Valenzuela in a 1969 black Chevrolet Impala.

A week later, on October 24, 1984, defendant came to Verduzco's home. Ray and Marlene Wells arrived a few minutes later. Defendant asked to borrow $5 from Ray Wells and then left. That night, the police came to Verduzco's house and seized defendant's car.

On October 31, 1984, at 12:42 a.m., Frank Bender heard gunshots. He went to the front door of his house and looked across the street to the residence of Ray and Marlene Wells. He noticed that the Wellses' dog appeared frightened. He also saw a black 1968 Chevrolet Caprice parked nearby with the engine running.[2] Shortly thereafter, he saw a silhouette cross the Wells yard and drive away in the car.

That same night, between 1 and 2 a.m., defendant called Benjamin Verduzco and said, "Bennie, I just did the big mouth in." When Verduzco asked, "Who," defendant said, "Remember the one who was there in the morning with the car." He referred to him as "R" and did not use a name. Defendant also said, "You know I take care of business. I had to do her, too." Defendant killed "her" because she saw him "do R." Defendant said, "They have gone to heaven with the angels." Defendant said he did it so that "they wouldn't be snitching no more."

Deputy Sheriff Robert Havercroft went to the Wells residence on the night of the murders. The rear door of the house was closed but not locked. He found Ray Wells's body on a couch in the living room and Marlene's body in the doorway between the dining room and kitchen. Deputy Havercroft found no evidence of theft, and no signs of forced entry.

Deputy Havercroft found three appointment books with many names and addresses. Attached to one of the appointment books were two small pieces of paper. The names "Chato" and "Pelon" were written on one piece of paper, and the name "Moses Verduzco" was written on the other.

Betty Phipps sold a 1968 Chevrolet Caprice to defendant in October 1984. The car was not in running condition; defendant told her he was going to fix it up. On October 7, 1984, a black 1968 Chevrolet Caprice was stolen from the Los Angeles zoo. The stolen 1968 Chevrolet Caprice was stopped at the

---

[2]Bender, who is a car buff, first told police it was a Chevrolet Impala. He determined it was a Chevrolet Caprice after examining a book of cars. The only difference between an Impala and a Caprice was that the Caprice had chrome strips. He remembered the car because it was in excellent shape.

United States-Mexico border at Tecate on December 15, 1984, while Salvador Rubio, a member of the Arizona Marivilla gang, was driving it. The license plate and vehicle identification numbers that were on the car did not belong to the car. One of the documents found in the glove compartment was a "pink slip" or ownership certificate with the name of Betty Phipps on the back.

*Defense Case.*

### 1. *Belvedere Park Murders.*

The defense presented evidence from law enforcement officers and others regarding inconsistent statements given by Adela Rodriguez and the other young women on the night of the shootings. Zebba Rodriguez testified that when she was walking back to the car she saw Gilbert Martinez, Anthony Aceves, and Manuel Torres arguing with about three other men. She was afraid, got in the car, heard shots, and ducked until she heard no more shots. When she raised her head, she saw Gilbert and Anthony lying on the ground. She did not see who had done the shooting.

David Martinez testified that he went to Belvedere Park on the night of the shooting with Carlos Tostado. He and Tostado had spent the day cruising, drinking beer and smoking PCP.

Dr. Griffith Thomas, a pathologist, testified that PCP can cause very bizarre and aggressive behavior. The amount of PCP in the victims' bodies would correlate with bizarre behavior. Dr. Donald Trockman, a forensic psychiatrist, testified that persons with amounts of PCP in their systems such as the victims showed were "unpredictable people" and that they "may attack you and try to kill you."

### 2. *Wells Murders.*

Detective Gene Hetzel interviewed Benjamin Verduzco on November 1, 1984. When he told Verduzco that the Wellses had been murdered, Verduzco appeared surprised and shocked. Verduzco did not mention that he had received a phone call from defendant on the night of the murders. He did not tell police about the phone call until much later.

Ralph Ortega testified that he went to a ranch in Tecate, Mexico with defendant and several other people on October 24, 1984. Ortega went back to Los Angeles and returned to Tecate with his wife and children on October 30, 1984. Defendant was still there. The next evening, October 31, Halloween, defendant and some others took Ortega's son trick-or-treating.

## GUILT PHASE CONTENTIONS

1. *Denial of Motion to Sever Counts.*

Defendant contends that the trial court erred in denying his motion to sever the Belvedere Park murders from the Wells murders. He argued for severance on the basis that the incidents were unrelated, not cross-admissible, and that the evidence in the Wells charges was far weaker than that in the Belvedere Park charges. The court denied severance based on the prosecutor's representation that Benjamin Verduzco would testify at trial and provide evidence of defendant's motive and premeditation concerning the Wells murders that linked them with the Belvedere Park murders.

Defendant renewed his motion to sever shortly before trial was scheduled to begin. The trial court denied the motion, again in reliance on the prosecutor's representation about Verduzco's anticipated testimony.

Section 954 provides in pertinent part: "An accusatory pleading may charge two or more different offenses . . . of the same class of crimes or offenses, under separate counts, . . . provided, that the court in which a case is triable, in the interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately. . . ."

The statutory requirements for joinder were met here because both incidents involved the same class of crimes—murder. ■ Since the requirements for joinder were satisfied, defendant can predicate error only on a clear showing of potential prejudice. (*People* v. *Johnson* (1988) 47 Cal.3d 576, 587 [253 Cal.Rptr. 710, 764 P.2d 1087].) "The burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried." (*People* v. *Bean* (1988) 46 Cal.3d 919, 938 [251 Cal.Rptr. 467, 760 P.2d 996].)

"The determination of prejudice is necessarily dependent on the particular circumstances of each individual case, but certain criteria have emerged to provide guidance in ruling upon and reviewing a motion to sever trial." (*Frank* v. *Superior Court* (1989) 48 Cal.3d 632, 639 [257 Cal.Rptr. 550, 770 P.2d 1119].) Refusal to sever may be an abuse of discretion where: (1) evidence on the crimes to be jointly tried would not be cross-admissible in separate trials; (2) certain of the charges are unusually likely to inflame the jury against the defendant; (3) a "weak" case has been joined with a "strong" case, or with another "weak" case, so that the "spillover" effect of aggregate

evidence on several charges might well alter the outcome of some or all of the charges; and (4) any one of the charges carries the death penalty or joinder of them turns the matter into a capital case. (*Ibid.*; see also *Williams* v. *Superior Court* (1984) 36 Cal.3d 441, 453 [204 Cal.Rptr. 700, 683 P.2d 699].)

■ Defendant bases his argument for prejudice primarily on the absence of cross-admissibility of the two sets of offenses. He argues that the trial court's reasoning did not establish that the evidence of the two separate incidents would have been admissible in its entirety had there been separate trials. According to defendant, all it established was that there would have been some minor evidentiary crossover as to the two incidents. However, even if defendant is correct on this point, it is now clear that cross-admissibility is not the sine qua non of joint trials. (*People* v. *Mason* (1991) 52 Cal.3d 909, 934 [277 Cal.Rptr. 166, 802 P.2d 950]; *Frank* v. *Superior Court, supra,* 48 Cal.3d at p. 641; *People* v. *Poggi* (1988) 45 Cal.3d 306, 321 [246 Cal.Rptr. 886, 753 P.2d 1082].) "While we have held that cross-admissibility ordinarily dispels any inference of prejudice, we have never held that the absence of cross-admissibility, by itself, sufficed to demonstrate prejudice." (*People* v. *Mason, supra,* 52 Cal.3d at p. 934.) "That the evidence would otherwise be inadmissible may be considered as a factor suggesting possible prejudice, but countervailing considerations that are not present when evidence of uncharged offenses is offered must be weighed in ruling on a severance motion. The burden is on the defendant therefore to persuade the court that these countervailing considerations are outweighed by a substantial danger of undue prejudice." (*People* v. *Bean, supra,* 46 Cal.3d at p. 939.)

Defendant did not carry that burden. The potential prejudice he asserted did not rise to the level of demonstrating that the court's denial of severance was an abuse of discretion. The court recognized that the anticipated testimony by Verduzco added significantly to the strength of the Wells case, thereby obviating the danger of a "spillover" effect from the Belvedere Park evidence. Indeed, the court suggested that it would reconsider the severance motion if the prosecution were not able to secure Verduzco's testimony. The inflammatory effect of defendant's gang membership as to the Belvedere Park case was neutralized by the fact that the victims were also gang members. Moreover, this was not a case in which capital charges resulted solely from the joinder of the two incidents. (Cf. *Williams* v. *Superior Court, supra,* 36 Cal.3d at p. 454.)

Defendant also made passing reference to the fact that he had separate defenses that would be prejudiced because he desired to testify as to one

incident but not the other. Although we have not addressed this theory of prejudice, it has been considered by federal courts. The federal courts have ruled that severance is not mandatory every time a defendant wishes to testify to one charge but not to another. " 'If that were the law, a court would be divested of all control over the matter of severance and the choice would be entrusted to the defendant.' " (*U.S.* v. *Archer* (7th Cir. 1988) 843 F.2d 1019, 1022.) The need for severance does not arise in federal courts " 'until the defendant makes a convincing showing that he has both important testimony to give concerning one count and strong need to refrain from testifying on the other.' " (*Ibid.*; quoting *Baker* v. *United States* (D.C. Cir. (1968) 401 F.2d 958, 977 [131 App.D.C. 7]; see also *United States* v. *Valentine* (10th Cir. 1983) 706 F.2d 282, 291.) Federal courts have required the defendant to present enough information to satisfy the court that the claim of prejudice is genuine and to enable it to weigh the considerations of economy and expedient judicial administration against the defendant's interest in having a free choice with respect to testifying. (*United States* v. *Valentine, supra,* 706 F.2d at p. 291.)

Defendant's showing fell far short of anything that would have satisfied the federal standards or any standard this court might adopt. Defendant neither explained the nature of the testimony he wished to give in the Belvedere Park case nor his reasons for not wanting to testify in the Wells case. The trial court did not abuse its discretion in denying severance.

■ Because the issue is raised on appeal following trial, we must also consider whether, "despite the correctness of the trial court's ruling, a gross unfairness has occurred from the joinder such as to deprive the defendant of a fair trial or due process of law." (*People* v. *Johnson, supra,* 47 Cal.3d at p. 590.) Defendant claims gross unfairness occurred as a result of the destruction of his ability to testify as to one incident but not as to the other. He has done no more, however, than make a bald assertion to that effect. "One asserting prejudice has the burden of proving it; a bald assertion of prejudice is not sufficient." (*Id.* at p. 591.) We conclude, therefore, that defendant has failed to show that denial of severance deprived him of a fair trial.

### 2. *Use of Peremptory Challenges.*

Defendant contends that the trial court erred in permitting the prosecutor to systematically exercise his peremptory challenges to excuse from the jury those prospective jurors who had expressed some scruples about imposition of the death penalty. Defendant acknowledges that we have addressed this contention on numerous occasions and have found no constitutional infirmity in permitting peremptory challenges by both sides on the basis of

specific juror attitudes on the death penalty. (See, e.g., *People* v. *Caro* (1988) 46 Cal.3d 1035, 1061 [251 Cal.Rptr. 757, 761 P.2d 680]; *People* v. *Belmontes* (1988) 45 Cal.3d 744, 799 [248 Cal.Rptr. 126, 755 P.2d 310].) Accordingly, we reject defendant's contention.

### 3. *Evidence of Defendant's Gang Membership.*

Defendant contends that the trial court erred in admitting evidence of his gang membership because it was irrelevant and prejudicial to his defense. Defendant objected pretrial by moving to preclude the prosecutor from referring to his alleged gang membership during opening statements. The prosecutor argued that evidence of gang membership was relevant to prove the motive for the murders at Belvedere Park. The trial court ruled that the prosecutor had made a showing that the evidence was admissible and denied the motion.

Defendant later moved to strike the testimony of Carlos Tostado and Benjamin Verduzco on the ground that the prosecutor had used them to put irrelevant and prejudicial testimony before the jury of defendant's alleged gang membership. The trial court denied the motion, ruling that the gang membership evidence had not caused undue prejudice.

Defendant argues that the evidence of gang membership was irrelevant and that the prosecutor never proved a gang-related motive for the shootings. We do not agree. The evidence established that the victims were members of a rival gang. The fact that the gangs purportedly had been at peace for seven years does not eliminate gang retaliation as a motive. Indeed, that appears to have been the only plausible motive. What we have here is a battle over turf. The Arizona Marivilla gang considered Belvedere Park to be its territory. The victims, members of a rival gang, were in Arizona Marivilla territory and were shot by a member of the Arizona gang without any other provocation.

Defendant argues that evidence of gang membership was found to be prejudicial and irrelevant in *People* v. *Cardenas* (1982) 31 Cal.3d 897 [184 Cal.Rptr. 165, 647 P.2d 569] and *People* v. *Perez* (1981) 114 Cal.App.3d 470 [170 Cal.Rptr. 619]. However, here, unlike *Cardenas* and *Perez*, the evidence was far more relevant. In *Cardenas* the prosecution introduced evidence of gang membership to prove bias of defense witnesses, but bias had already been established by other testimony. We held that the admission of gang membership evidence was an abuse of discretion under Evidence Code section 352 because the evidence was of minimal probative value, cumulative, and extremely prejudicial. In *Perez*, the evidence of gang membership had no relevance to any issue at trial. In this case, the court did not err in the admission of gang affiliation.

4. *Exclusion of Evidence of Third Party Culpability.*

 Defendant contends that the trial court improperly excluded, pursuant to Evidence Code section 352, evidence of third party culpability as to the Wells murders. We find no abuse of the court's discretion to exclude such evidence.

Deputy Havercroft found a daily appointment book and two weekly planners at the Wells residence. The books contained many names and addresses. Two small pieces of paper were clipped to the daily appointment book. The names "Chato" and "Pelon" were written on one piece of paper, and the name "Moses Verduzco" was written on the other piece of paper. Defendant's nickname is "Chato."

The defense sought to prove that Ray Wells was the center of a violent criminal operation involving drugs and stolen cars and guns, and that any number of criminal accomplices or rivals could have killed him. Therefore, the defense sought to cross-examine Deputy Havercroft about the names found in the appointment book and weekly planners and to introduce those documents into evidence. After considerable argument and an offer of proof, the court ruled that the evidence was inadmissible because "it still does not point the finger at any individual nor does it rise at all above possible ground of suspicion."

 A criminal defendant has a right to present evidence of third party culpability if it is capable of raising a reasonable doubt about his own guilt. This rule does "not require that any evidence, however remote, must be admitted to show a third party's possible culpability. . . . [E]vidence of mere motive or opportunity to commit the crime in another person, without more, will not suffice to raise a reasonable doubt about a defendant's guilt: there must be direct or circumstantial evidence linking the third person to the actual perpetration of the crime." (*People* v. *Hall* (1986) 41 Cal.3d 826, 833 [226 Cal.Rptr. 112, 718 P.2d 99].)

 The trial court properly found defendant's showing insufficient. The defense had no evidence of another person's actual motive to commit the crimes. Instead, the defense merely raised the possibility that others had a motive to kill Ray and Marlene Wells. Although the defense identified two persons with plausible motives, they had no direct or circumstantial evidence linking them to actual perpetration of the crimes.

The present case is similar to *People* v. *Edelbacher* (1989) 47 Cal.3d 983, 1017-1018 [254 Cal.Rptr. 586, 766 P.2d 1], where the defense sought to

introduce evidence concerning the victim's association with "Hell's Angel-type people" and drug dealers in order to prove that someone other than the defendant committed the crime. We affirmed the trial court's ruling that the evidence was inadmissible. It did not identify a possible suspect other than the defendant or link any third person to commission of the crime, or even establish an actual motive rather than a possible or potential motive.

Defendant's reliance on *Crane* v. *Kentucky* (1986) 476 U.S. 683 [90 L.Ed.2d 636, 106 S.Ct. 2142] is misplaced. That case bears no similarity to the facts of the present case. *Crane* involved the exclusion of testimony regarding the circumstances surrounding the taking of the defendant's confession. The Supreme Court held that the ruling had denied the defendant a fair opportunity to present a defense.

■ As an additional basis for admission of this evidence defendant argues that the evidence was admissible pursuant to Evidence Code section 356. That argument is also unavailing. Evidence Code section 356 provides in pertinent part: "Where part of an act, declaration, conversation, or writing is given in evidence . . . , any other act, declaration, conversation, or writing which is necessary to make it understood may also be given in evidence."

Contrary to defendant's contention, Evidence Code section 356 did not require admission of the appointment book and weekly planners. Those books simply were not part of a writing given in evidence by the prosecution. While the prosecution introduced independent slips of paper that were clipped to the appointment book, the book and the weekly planners themselves were unnecessary to an understanding of the slips of paper.

5. *Admissibility of Prior Conviction for Impeachment.*

■ Defendant contends that the trial court erred in ruling that his prior conviction for assault with intent to commit murder would be admissible for impeachment purposes. We do not agree. The court followed the analysis set forth in *People* v. *Castro* (1985) 38 Cal.3d 301 [211 Cal.Rptr. 719, 696 P.2d 111], interpreting article I, section 28, subdivision (f) of the California Constitution, which was enacted as part of Proposition 8 in 1982. It properly concluded that defendant's reliance on pre-*Castro* cases was not determinative and that defendant's conviction for assault with intent to commit murder involved moral turpitude. (*People* v. *Olmedo* (1985) 167 Cal.App.3d 1085, 1097-1098 [213 Cal.Rptr. 742].) The court then exercised its discretion under Evidence Code section 352, concluding that the probative value outweighed the prejudicial effect. The court noted that it could not assess the

impact of the prior conviction on defendant's testimony because no offer of proof as to that testimony had been made. Contrary to defendant's contention, the court did not state that an offer of proof was required and, indeed, noted that California law did not then require an offer of proof.[3] Because of the similarity of the prior to one of the charged crimes, the court offered to sanitize the prior by allowing reference to the conviction only as a prior felony conviction. It did not abuse its discretion in doing so. (See *People* v. *Massey* (1987) 192 Cal.App.3d 819, 825 [237 Cal.Rptr. 734].)

Defendant's reliance on pre-*Castro* and Proposition 8 cases is unpersuasive. ■ As we noted in *People* v. *Castro, supra,* 38 Cal.3d at page 312, the intention of the drafters of Proposition 8 was to "restore trial court discretion as visualized by the Evidence Code and to reject the rigid, black letter rules of exclusion" which had been grafted onto the code by our decisions. Accordingly, we find no abuse of discretion in the trial court's ruling.

6. *Request for Ruling in Advance on Scope of Cross-examination of Defendant.*

■ Defendant contends that the trial court's refusal to rule on the scope of permissible cross-examination if he took the witness stand to testify on the Belvedere Park murders violated his right to testify on his own behalf.

Before the defense rested its case, defense counsel told the court that defendant wished to testify about the Belvedere Park incident on October 14, 1984, but that he did not wish to testify about the Wells murders on October 31, 1984. Counsel asked the court to limit any cross-examination of defendant to the Belvedere Park charges. Counsel indicated that defendant would testify on the issue of self-defense but gave no further details as an offer of proof. Defense counsel argued that the two incidents were entirely separate and that the direct and cross-examination could therefore be limited to the Belvedere Park charges. The prosecution disagreed, asserting that there was evidentiary spillover regarding defendant's efforts to hide the beige and brown Monte Carlo in Verduzco's garage and Ray Wells's apparent knowledge of the transaction. The trial court refused to make a ruling in advance of defendant's actual testimony, stating "whether a defendant can effectively limit the cross-examination depends upon the direct examination and may not be known until he testifies. The law is that a defendant cannot artificially limit the cross-examination and direct examination."

---

[3]We have since held that testimony by the defendant is a prerequisite to appellate review. (*People* v. *Collins* (1986) 42 Cal.3d 378, 383 [228 Cal.Rptr. 899, 722 P.2d 173].) The ruling here preceded our holding in *Collins*, which was to be applied prospectively only.

Defendant has failed to show that the court's ruling was erroneous. None of the authorities cited is directly on point, and none would have required the ruling sought here. Indeed, there is authority supportive of the trial court's action. (See *People* v. *Keenan* (1988) 46 Cal.3d 478, 410-513 [250 Cal.Rptr. 550, 758 P.2d 1081]; *People* v. *Williams* (1988) 44 Cal.3d 883, 912-913 [245 Cal.Rptr. 336, 751 P.2d 395].) The court acted well within its discretion.

### 7. Cross-examination of Dr. Trockman.

Dr. Donald Trockman, a forensic psychiatrist, testified as an expert witness for the defense in support of the self-defense claim as to the Belvedere Park counts. Dr. Trockman testified that there was a high correlation between ingestion of PCP and unpredictable violence and hostility. Based on his review of the autopsy report of Gilbert Martinez showing bruises and high levels of PCP and alcohol in his blood, Dr. Trockman concluded that at the time of his death, Martinez was in an angry, aggressive, violent mood. He could not reach any specific conclusion as to the mood of Anthony Aceves because he had lived for three days after the shooting.

On cross-examination Dr. Trockman testified that the mental state reached under the influence of alcohol is different from the mental state reached under the influence of PCP. The prosecutor reminded the doctor that he had testified differently in previous cases where the person was charged with being under the influence of PCP and asked the doctor whether his answer was dependent on his function in the particular case.

The prosecutor asked Dr. Trockman if Gilbert Martinez was in a violently aggressive mood during his entire period of PCP intoxication, and was told: "The important time. The time when he confronted the accused in this case." The prosecutor then asked how he knew the victim had confronted the accused and whether the defense had told him what he had to accomplish to dispel the prosecution case.

The prosecutor also asked Dr. Trockman whether, by his testimony, he tries to affect the outcome of a case. The prosecutor queried whether the witness instructed attorneys on the questions they should ask for dramatic effect, to maintain the interest of the jury, and to dispel inferences of defense bias.

During closing argument the prosecutor referred to the doctor's admission that he had testified differently in other cases about the distinction between alcohol and PCP intoxication. Based on the admission the prosecutor stated that the doctor "is a liar."

 Defendant contends that the prosecutor committed prejudicial misconduct in so questioning the doctor and in calling him a liar during closing argument. Although defendant objected to the questions on cross-examination, he raised no objection during argument to the prosecutor's use of the term "liar." Defendant has thus waived the latter point since any harm caused by this characterization could have been cured by a timely objection and an admonition. (*People* v. *Green* (1980) 27 Cal.3d 1, 27 [164 Cal.Rptr. 1, 609 P.2d 468].)

In any event, there was no prosecutorial misconduct. The prosecutor was entitled to question the doctor's testimonial consistency and possible bias. (*People* v. *Meneley* (1972) 29 Cal.App.3d 41, 60 [105 Cal.Rptr. 432].) Referring to testimony as "lies" is an acceptable practice so long as the prosecutor argues inferences based on the evidence and not on the prosecutor's personal belief. (*People* v. *Edelbacher, supra,* 47 Cal.3d 983, 1030.) Closing argument may be vigorous and may include opprobrious epithets when they are reasonably warranted by the evidence. In this case, the prosecutor's argument was based on the evidence and amounted to nothing more than vigorous yet fair argument. (*Ibid.*)

Defendant's reliance on *People* v. *McGreen* (1980) 107 Cal.App.3d 504 [166 Cal.Rptr. 360] (overruled on other grounds in *People* v. *Wolcott* (1983) 34 Cal.3d 92 [192 Cal.Rptr. 748, 665 P.2d 520]) is misplaced. In *McGreen,* the prosecutor attempted to discredit the expert witness by showing that he had received B and C grades in graduate school and that the witness's membership in certain scientific societies was a sham. The trial court eventually foreclosed further cross-examination on these grounds. The prosecutor nevertheless persisted in the line of questioning and additionally asserted that the witness's testimony had been stricken in another case because it was "patently unbelievable." When asked for authority to support the admission of such evidence of the witness's "unbelievability," the prosecutor admitted he had none. Additionally, during argument the prosecutor suggested there had been an ethics investigation of the witness and characterized the witness as an habitual liar who prostituted his credentials for $50 an hour. (*Id.* at pp. 514-517.)

In no way was the cross-examination in this case comparable to that in *McGreen.* Here, the prosecutor elicited testimony tending to show bias by questioning the witness about his contrary testimony in previous cases and his interest in helping the defense. Such cross-examination was proper. (See *People* v. *Rich* (1988) 45 Cal.3d 1036, 1088 [248 Cal.Rptr. 510, 755 P.2d 960].)

### 8. *Cross-examination of Ralph Ortega.*

Defendant contends the prosecutor committed multiple instances of prejudicial misconduct during the cross-examination of Ralph Ortega, defendant's alibi witness in the Wells case.

Ralph Ortega testified for the defense that he went with defendant, Eugene Valenzuela, and others to a small ranch in Tecate, Mexico on October 24, 1984. He testified further that he stayed four days and returned to Los Angeles while defendant remained at the ranch. Defendant was still there when Ortega returned around midnight on October 30. They stayed on at the ranch; defendant went with Ortega the next night, Halloween eve, to take Ortega's son trick-or-treating.

On cross-examination the prosecutor elicited from Ortega that he had been arrested about 5:45 a.m. on October 24, 1984, near the Mexican border. He established that Ortega was not released from custody until about 5 p.m. that evening. The prosecutor noted that this information had not been revealed during Ortega's testimony on direct examination and asked Ortega if defense counsel had tried to avoid this subject. The prosecutor made references to Ortega's decision to "fess up" because "I was on to you" and asked if defense counsel had explained to him that it was necessary to put defendant in Tecate around 10 or 11 a.m. on October 24. The prosecutor established that Ortega and his friends just "hung around" the ranch. The prosecutor also established that Ortega purchased and delivered food and supplies to defendant and Valenzuela during their entire stay in Tecate.

The prosecutor asked Ortega if counsel had explained to him that he would be liable as an accessory after the fact if he ever admitted that he knew that defendant had committed the Belvedere Park murders at the time he took defendant to Tecate. Ortega said no and denied any knowledge that defendant was involved.

Later, when questioning Ortega about his knowledge of the seizure of the 1968 Chevrolet Caprice at the border, the prosecutor stated: "Are you going to stop your lying here in court?" Defense counsel objected to the prosecutor's yelling, but not to the question itself.

Defendant contends that the prosecutor committed misconduct by repeatedly suggesting that defense counsel had colluded with Ortega in the fabrication of Ortega's alibi testimony. In our view, the record, as described above, does not support the assertion. Moreover, defendant has waived the point by failing to object and request a timely admonition. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.)

■ Defendant also claims that the prosecutor used his cross-examination of Ortega to express his own personal disbelief in Ortega's testimony. Defendant refers to the questions suggesting that Ortega was lying. Again, no objection was raised below, and the point is therefore waived since any harm could have been cured by a prompt admonition. (*People* v. *Green*, *supra*, 27 Cal.3d at p. 28.)

■ Defendant asserts that the prosecutor improperly tried to impeach Ortega with evidence of a drug arrest. Ortega was arrested as an accessory to murder in this case, but he was released from custody after one day and charges were never filed. When questioning Ortega about his arrest in this case, the prosecutor queried, "You were also arrested for something else, weren't you?" Defense counsel's objection was *sustained*. No admonition was requested or given. Under these circumstances, we fail to see how defendant could have been prejudiced by this question since the jury was already aware that Ortega had been arrested on the way to Tecate for possession of methamphetamines. Moreover, the jury was given the standard instruction (CALJIC No. 1.02) stating that a question is not evidence and that they should not guess what the answer might have been when an objection is sustained.

■ Defendant also contends that the prosecutor improperly questioned Ortega about his failure to volunteer his exculpatory information to the police prior to trial. Defendant asserts that the prosecutor was aware that Ortega had been arrested as an accessory and had exercised his constitutional right to remain silent. Indeed, Ortega explained that he had never told the police about the alibi because he had refused to be interviewed. On redirect Ortega explained that he had given his exculpatory information to the defense attorneys and their investigator a year before the trial. Therefore, even assuming that the prosecutor's questioning in this area amounted to misconduct, we conclude that defendant suffered no significant prejudice as a result of it.

■ Defendant complains about questions concerning remarks made in the elevator after Ortega's testimony on direct examination. The prosecutor, defense counsel, and Ortega had a conversation in the elevator as they left the courthouse. No jurors were present in the elevator. The following morning, defense counsel reopened direct examination and questioned Ortega about the conversation in the elevator. Ortega testified that the prosecutor threatened him and said "someone is going to jail behind this."

On cross-examination the prosecutor asked Ortega whether he (the prosecutor) had made the alleged threat in response to a question asked by

defense counsel. When Ortega answered yes, the prosecutor asked if defense counsel had said "Well, how do you guys like what happened in there today?" Defense counsel objected and denied making the statement. The objection was overruled. Ortega responded that he had heard defense counsel say only, "What's up?"

Defendant argues that the prosecutor's question was asked in bad faith. The claim is supported by nothing more than defendant's bald assertion. No police officers who overheard the conversation were called as witnesses by either the prosecution or the defense. Since the record contains no basis for branding the prosecutor's questioning as bad faith, we reject defendant's contention.

9. *Prosecutor's Argument.*

Defendant contends that the prosecutor committed prejudicial misconduct in a number of respects in addition to the claims that we have already discussed. First, defendant charges the prosecutor with improper attacks on defense counsel. During the course of his lengthy review of the testimony of virtually every witness, the prosecutor referred to attempts by defense counsel to mislead the jury and, at one point, accused defense counsel of perpetrating a fraud on the court. The prosecutor also referred to defense theories and evidence as "ridiculous" and "nonsense." Defendant interprets the prosecutor's characterization of the defense testimony as lies and concoctions, to be an accusation of defense fabrication of evidence. Defendant also complains about the prosecutor's repeated references to defense counsel's reaction to particular testimony.

 "A prosecutor may vigorously argue his case, marshalling the facts and arguing inferences to be drawn therefrom. (*People* v. *Fosselman* (1983) 33 Cal.3d 572, 580 [189 Cal.Rptr. 855, 659 P.2d 1144].) We have held he may not express a personal belief in defendant's guilt, in part because of the danger that jurors may assume there is other evidence at his command on which he bases this conclusion. (*People* v. *Bain* (1971) 5 Cal.3d 839, 848 [97 Cal.Rptr. 684, 489 P.2d 564].) We have also held it improper for the prosecutor to imply that defense counsel has fabricated evidence or otherwise to portray defense counsel as the villain in the case. It is not necessary to find that such implication impinges upon defendant's constitutional right to counsel. (Compare *People* v. *Turner* (1983) 145 Cal.App.3d 658, 674 [193 Cal.Rptr. 614].) Instead it is sufficient to note that defendant's conviction should rest on the evidence, not on derelictions of his counsel. (*People* v. *Perry* (1972) 7 Cal.3d 756, 790 [103 Cal.Rptr. 161, 499 P.2d 129]; *Bain, supra,* 5 Cal.3d at p. 847.) Casting uncalled for aspersions on defense

counsel directs attention to largely irrelevant matters and does not constitute comment on the evidence or argument as to inferences to be drawn therefrom." (*People* v. *Thompson* (1988) 45 Cal.3d 86, 112 [246 Cal.Rptr. 245, 753 P.2d 37].)

■ Defendant objected to many, but not all, of the cited instances. For the most part, his objections were overruled. The court did, however, sustain his objection to the accusation of perpetrating a fraud on the court. It admonished the jury to disregard the comment, stating that there had been no perpetration of a fraud by any lawyer in this case. While we agree that many of the cited remarks were improper, we do not find them to have been prejudicial. The prosecutor was entitled to argue the inconsistencies in the evidence and even to characterize inconsistent testimony as "lies." (See *People* v. *Edelbacher, supra,* 47 Cal.3d at p. 1030.) Here, however, the prosecutor went beyond that point on several occasions, denigrating counsel instead of the evidence. Personal attacks on opposing counsel are improper and irrelevant to the issues. The prosecutor's reference to counsel's reaction to particular evidence was also improper for the same reason, but we do not interpret it as a charge of fabrication of evidence. All of these remarks were a small part of the prosecutor's very lengthy review of the evidence presented. They were clearly recognizable as an advocate's hyperbole. (See *People* v. *Poggi, supra,* 45 Cal.3d at p. 340.) Accordingly, we find no reasonable probability that the jury would have reached a more favorable result absent the objectionable comments. (*People* v. *Green, supra,* 27 Cal.3d at p. 36.)

■ Defendant also contends that the prosecutor committed misconduct because he expressed personal opinions regarding the defense case. Defendant refers to the prosecutor's statement that "I shake my head in disbelief every time I think about it [Ralph Ortega's testimony]." Defendant also makes reference to the prosecutor's statement: "They know the defendant killed those boys. And they know he killed Ray and Marlene Wells." Finally, defendant complains about the prosecutor's argument about the disparities between defense promises of proof in the opening statement and the trial evidence. Defendant waived all but the first point by failing to raise a timely objection at trial. (*People* v. *Green, supra,* 27 Cal.3d at p. 27.) As to the first point, the remark was made in the context of reviewing the discrepancies in defense testimony and was not likely to be understood as being based on anything outside the record.

■ Defendant further charges that the prosecutor committed misconduct by referring to defendant's failure to testify at trial. The prosecutor argued that he forestalled defense testimony by preemptively proving that

defendant did not need glasses at the time of the Belvedere Park offenses: "I should not have proved to you earlier in the trial that he didn't need glasses at the time in the park, because then you would have heard, 'Well, I was in the park, and you can see all the witnesses say I didn't have any glasses on. And I saw one guy go do my friend in with a knife. And another one came to me, and I thought he was going to do me in. I ran over to help my friend and shot him, and I shot him twice. I saw the other one. I couldn't see good who was doing what to me, so I shot him. And the other one coming at me, I shot him, too, because I just couldn't see good.' That's what you would have heard." A defense objection under *Griffin* v. *California* (1965) 380 U.S. 609 [14 L.Ed.2d 106, 85 S.Ct. 1229] (*Griffin*) was sustained, and the court admonished the jury to disregard the prosecutor's comments to the extent they reflected on the defendant's not testifying. The prosecutor referred to the glasses again in his rebuttal, stating: "And I argued in my opening argument the fact that you would hear or you would have heard, had we given them a little rope to hang themselves, also you would have heard, 'Well, I couldn't see. I didn't have my glasses on, so therefore that's why I shot this person and I had to shoot this person.' " The defense objection was overruled.

We believe that the court's initial admonition was sufficient to obviate any *Griffin* concern. To the extent that the rebuttal comment could be construed as a reference to defendant's failure to testify, in context, it was clearly harmless. The reference was a minor feature in this seemingly marathon argument.

 Defendant contends that the prosecutor committed misconduct by referring to defendant's courtroom appearance (wearing a suit, wearing reading glasses, being clean-shaven) as a "ploy" and by asserting that defendant did not need to wear the glasses all the time during the trial. Defendant waived these points by failing to object at trial, since any harm could have been cured by timely objection and prompt admonition. (*People* v. *Green*, *supra*, 27 Cal.3d at p. 27.) In any event, these statements could not have had a prejudicial effect in light of the overwhelming evidence of the Belvedere Park killings.

In sum, we find no denial of due process or a fair trial as a result of any misconduct committed by the prosecutor. Both sides seemed unduly argumentative and personal on occasion, but such instances were not so frequent or severe as to detract from the jury's fair consideration of the evidence.

10. *Instruction on Reasonable Doubt.*

In a supplemental brief, defendant argues that the instruction on reasonable doubt, CALJIC No. 2.90, is constitutionally flawed, citing *Cage* v.

*Louisiana* (1990) 498 U.S. 39 [112 L.Ed.2d 339, 111 S.Ct. 328]. Similar challenges to CALJIC No. 2.90 were raised and rejected in *People* v. *Jennings* (1991) 53 Cal.3d 334, 385-386 [279 Cal.Rptr. 780, 807 P.2d 1009] and *People* v. *Johnson* (1992) 3 Cal.4th 1183, 1234-1235 [14 Cal.Rptr.2d 702, 842 P.2d 1]. As we noted in *Jennings* and *Johnson*, despite use of the term "moral certainty" in CALJIC No. 2.90, the instruction does not suffer from the flaws condemned in *Cage* v. *Louisiana, supra,* 498 U.S. 39.

Defendant also cites Justice Mosk's criticism of CALJIC No. 2.90 in his concurring opinion in *People* v. *Brigham* (1979) 25 Cal.3d 283, 292-316 [157 Cal.Rptr. 905, 599 P.2d 100]. Recognizing that CALJIC No. 2.90 is a verbatim copy of section 1096, Justice Mosk urged the Legislature to redraft the definition of reasonable doubt in section 1096 to make it intelligible to modern juries. The Legislature has not responded. As Justice Mosk recognized, such changes must come from the Legislature.

## PENALTY PHASE FACTS

### *Evidence in Aggravation.*

The penalty case-in-aggravation consisted of evidence of three prior crimes by defendant: 1) a 1978 assault upon a police officer; 2) a 1979 conviction of assault with intent to commit murder; and 3) a 1985 assault on a fellow jail inmate.

### 1. *1978 Assault.*

Deputy Sheriff Randall Prestwich testified that on May 13, 1978, he and his partner heard gunshots in the vicinity of Arizona Street in Los Angeles. They saw defendant and two other men run from a house. Defendant had a shotgun. Deputy Prestwich yelled at the men to freeze. The other two ran off, and defendant brought the gun up to his waist and flinched, as if he expected the gun to go off. Deputy Prestwich fired a shot at defendant and saw defendant flinch again. Defendant turned and ran. Deputy Prestwich caught him and arrested him for assault on a police officer.

### 2. *1979 Assault.*

Ernest Leos testified that on March 17, 1979, he and his son were in their driveway when Jesse Trujillo's car stopped in front of the driveway. Leos's son, Ernest, Jr., went over to the car and was shot while talking to someone in the car. Defendant was convicted of assault with intent to commit murder for this shooting.

### 3. *1985 Assault.*

Deputy Sheriff Kenneth Salazar testified that on March 21, 1985, defendant was working as a trusty in the high security section of Los Angeles County jail. After defendant had finished passing out and collecting breakfast trays, he was ordered back to his cell so that Guy Walker could leave his cell to take a shower. Walker received a razor blade and soap and went into the shower. Defendant was then released from his cell to complete his duties.

Deputy Lujan saw defendant run into the shower area, approach Walker, and move his fist toward Walker's head. Deputy Salazar saw defendant run from the shower area to the toilet area. As he followed defendant, Deputy Salazar saw Guy Walker slumped on the floor with blood on his face. Deputy Salazar heard a toilet flush. When he reached the toilet area, defendant was standing over a toilet. Deputy Salazar found a small piece of razor in the doorway leading to the toilet area. Walker's injuries could have been caused by a razor blade.

*Evidence in Mitigation.*

### 1. *Walker Incident.*

Guy Walker testified for defendant. He and defendant had several arguments in March 1985 because defendant had been named trusty and had the cell Walker wanted. Walker tried to cut defendant's throat and to stab him. That same week, defendant entered the shower area and they fought.

### 2. *In-custody Behavior.*

Deputy Sheriffs Ronald Hernandez and Anthony Campbell, assigned to the Los Angeles County jail, had never had problems with defendant. Defendant was helpful and friendly, and both deputies voted for him to be appointed a jail trusty.

### 3. *Defendant's Family and Friends.*

Patricia Solis struck up a friendship with defendant after she had been dismissed as a prospective juror in the case. She described defendant as an intelligent and sensitive person, who cared about other people, and loved his children.

Edward Dominguez had known defendant since 1976, when he opened his liquor store in the neighborhood. Defendant was always a gentleman and, on one occasion, prevented a fight in the store.

Richard Rodriguez, a gang consultant affiliated with the California Youth Authority, testified that although Arizona Marivilla was once a street gang, since 1982 it had been incorporated as a neighborhood association. Defendant participated in the youth program when he was released from prison in May 1984.

Defendant's wife and son described him as a nice, lovable man who is a good father.

Defendant's mother, Elizabeth Luna, testified that defendant's father, who had been abusive to her and the children, died when defendant was six or seven. Luna then "went wild," and began drinking and partying. Defendant became "the man of the house" upon his father's death, and he took care of his four brothers and sisters, even stealing on occasion so they could eat.

PENALTY PHASE CONTENTIONS

1. *Evidence of Gang Affiliation.*

██ Defendant contends that the erroneous admission of his gang affiliation in the guilt phase prejudiced him in the penalty phase because he had to call Richard Rodriguez to rebut that evidence and the prosecutor improperly cross-examined him.

As previously noted, Richard Rodriguez testified in mitigation that the Arizona Marivilla gang, which had been violent, was reformulated in 1982 as a neighborhood association with the goal of keeping the peace. He testified that after defendant left prison in 1984 he was not involved in gang activities and that defendant was working to keep young people out of gangs. On cross-examination the prosecutor asked Rodriguez if it was true that Arizona Marivilla was one of the most violent gangs in East Los Angeles and responsible for most of the murders in that area from 1975 to 1985. The prosecutor also asked if defendant was one of the most active members.

We find no error. First, we have already concluded that the evidence of defendant's gang membership was properly admitted at the guilt phase. Second, the prosecutor was entitled to attempt to negate the evidence in mitigation to the effect that the Arizona Marivilla was now simply a peaceful neighborhood association. (*People* v. *Thompson, supra,* 45 Cal.3d at p. 124.) ██ It is well established that the prosecution may inquire of a defense reputation witness whether he has heard of acts or conduct by the defendant · inconsistent with the witness's testimony so long as the People have a good faith belief that the acts or conduct about which they wish to inquire actually

took place. (*People* v. *Siripongs* (1988) 45 Cal.3d 548, 578 [247 Cal.Rptr. 729, 754 P.2d 1306].)

### 2. *Consideration of Defendant's Age.*

Defendant contends that the jury was improperly allowed by the court and prosecutor to consider his age as a factor in aggravation. Defendant was 26 at the time of the offenses. The court rejected defendant's special instruction stating that if defendant's age were to be considered, it could be considered only as a mitigating factor. The court gave CALJIC No. 8.84.1, which permitted the jury to consider "the age of the defendant at the time of the crime" in determining the appropriate penalty.

During the penalty argument, the prosecutor reviewed the factors listed in CALJIC No. 8.84.1 and argued: "The age of the defendant at the time of the crime. He is obviously old enough to know the difference between right and wrong, and that's aggravation."

Defendant acknowledges that we have rejected attacks on the instruction given. (See, e.g., *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 777-779 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Lucky* (1988) 45 Cal.3d 259, 301-302 [247 Cal.Rptr. 1, 753 P.2d 1052].) As we noted in *People* v. *Lucky*, *supra*, at page 302, mere chronological age should not of itself be deemed either aggravating or mitigating: "In our view, the word 'age' in statutory sentencing factor (i) is used as a metonym for any age-related matter suggested by the evidence or by common experience or morality that might reasonably inform the choice of penalty. Accordingly, either counsel may argue any such age-related inference in every case." (*Ibid.*)

The court did not err in rejecting defendant's proposed special instruction, since it stated that inferences relating to defendant's age could be considered only as a mitigating factor. Nor was there any impropriety in the prosecutor's argument. The prosecutor's argument that defendant was old enough to know better, thus making it aggravating, is an age-related inference that has been found permissible in a number of cases. (See *People* v. *Bonin* (1988) 46 Cal.3d 659, 704-705, fn. 6 [250 Cal.Rptr. 687, 758 P.2d 1217]; *People* v. *Brown* (1988) 46 Cal.3d 432, 456-457 [250 Cal.Rptr. 604, 758 P.2d 1135].)

Defendant urges us to reexamine our construction of the age factor in *People* v. *Lucky*, *supra*, 45 Cal.3d 259 and succeeding cases, arguing that the unfettered discretion regarding how the factor is to be considered renders it unconstitutional under the principles of *Gregg* v. *Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909] and *Maynard* v. *Cartwright* (1988) 486

U.S. 356 [100 L.Ed.2d 372, 108 S.Ct. 1853]. We rejected a similar argument in *People* v. *Babbitt* (1988) 45 Cal.3d 660, 716 [248 Cal.Rptr. 69, 755 P.2d 253] and are not persuaded that we should reexamine that reasoning. (See also *People* v. *Edwards* (1991) 54 Cal.3d 787, 844 [1 Cal.Rptr.2d 696, 819 P.2d 436].)

3. *Reference to Suffering by Victims and Their Families.*

■ Defendant contends that the prosecutor violated *Booth* v. *Maryland* (1987) 482 U.S. 496 [96 L.Ed.2d 440, 107 S.Ct. 2529] and *South Carolina* v. *Gathers* (1989) 490 U.S. 805 [104 L.Ed.2d 876, 109 S.Ct. 2207] by urging the jury to consider characteristics of the victims and the loss suffered by the victims' families. The allegedly objectionable references were made in response to defense counsel's argument that the jury should consider defendant's difficult childhood, including the fact that he had to become the man of the house at the age of eight, as illustrated by a photograph of defendant at his father's funeral.[4]

The prosecutor stated: "I want you to think about this. I want you to look at this picture very hard. When you have got it back there in that room look at it. How hurtful it was at the time or hurtful it is when you see it years later. But remember the Aceves family. Replace all these faces. Put Anthony Aceves in the casket.

"Put Anthony Aceves in that casket. Put his family around it. Because it happened two years ago they are not victims? They are hurt. He should be given compassion? The way he executed that boy?

"Think about the parents and the family of Gilbert Martinez. When they were standing around his casket and they were crying and they were saying 'My God, how could this happen to my child?'

"Marlene Wells. When she was on the ground and the defendant was standing over her and putting two bullets in the back of her head just before she is looking up at him. 'Don't kill me.' Begging for her life. And he shoots her brutally in the back of the head.

"Think about it. They are funerals. Every time you look at this funeral photograph produced by the defense you think of their funerals. You think of their families. And you are called upon to impose death in cases like this when it's so aggravated. How many people must he kill?"

---

[4]Defendant's mother testified that defendant was six or seven when his father died. The prosecutor, however, referred to defendant as having been eight at the time of his father's death.

During the pendency of this appeal, both *Booth* v. *Maryland, supra*, 482 U.S. 496 and *South Carolina* v. *Gathers, supra*, 490 U.S. 805, were largely overruled. In *Payne* v. *Tennessee* (1991) 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597], the United States Supreme Court held that the use of victim impact evidence does not offend the Eighth Amendment guaranty of an individualized penalty assessment in a capital trial. We have since held that the injury inflicted by the defendant—including evidence about the victim and the impact of the crime on the victim's family—is one of the circumstances of the crime, evidence of which is admissible under section 190.3, factor (a). (*People* v. *Edwards, supra*, 54 Cal.3d 787, 833-836; *People* v. *Fierro* (1991) 1 Cal.4th 173, 234-235 [3 Cal.Rptr.2d 426, 821 P.2d 1302].)

The prosecutor's remarks were permissible under the principles set forth in *Payne* v. *Tennessee, supra*, 501 U.S. __ [115 L.Ed.2d 720, 111 S.Ct. 2597] and *People* v. *Edwards, supra*, 54 Cal.3d 787. Accordingly, defendant's claim must be rejected.

4. *Biblical References.*

Defendant contends that the prosecutor violated his rights to due process, a fair trial, separation of church and state, and freedom from cruel and unusual punishment by quoting biblical authority in his final argument. We agree that the prosecutor's argument was improper, but we conclude that it does not require reversal of the penalty judgment.

During final argument, defense counsel stated, inter alia: "It seems almost to be in the theater of absurd to be talking about life and death. I don't know what gives me the right to talk about it . . . . [¶] What we have to really talk about is values, purpose. You have to confront yourselves in terms of your own feelings, what you demand from society, what you really demand from Mr. Sandoval, what you demand from yourselves. [¶] Revenge? That's really what we're talking about. When you convicted Mr. Sandoval of these four murders and found the special circumstances to be true, you already guaranteed one thing. Fred Sandoval will die in the penitentiary is one of them in the State of California. Period. He will never come out. He will die in the penitentiary. [¶] The question is is he going to die whatever it is in three years in the gas chamber or is he going to die of old age in the pen or is he going to die because someone stabs him in the back in the penitentiary? But the reality is that he is going to die in the penitentiary. That's already been decided and you decided that.

"And in facing you again and thinking about that and thinking about how hard your job is, how difficult your job is, in reality you could sit, play God

to an individual. . . . [¶] In some sense, I really don't know which is worse, execution or the gas chamber or that kind of life in prison. But you have that power alone. Any one of you can stop the execution alone. You have that power. I have never held that awesome power of holding a person's life in my hands. You have that power. You alone. [¶] You also have that responsibility that you are going to carry for the very rest of your life whether you push that button or not. And the bottom line is it's revenge. Because society to you because you are society, you want to extract revenge. Or is it bad enough to stop it and let this man live out his life in prison? . . . [¶] I have come to grasp it now. I looked at you in the eye and you can look back at me. Doesn't change anything. Nothing will bring back Anthony Aceves and Gilbert Martinez and the two Wells. Nothing. Won't change. Bottom line is revenge. Just pure and simple. Vengeance.

"If that's what you want, that's what you felt, you push the button. An eye for an eye, a tooth for a tooth, a stripe for a stripe, a life for a life. [¶] I don't think society requires revenge. I don't think that you require revenge. An eye for an eye. [¶] Ghandi [sic] said we do this eye for an eye thing, make society require it and do it, what happens is the whole world becomes blind. The light is shut out. That's not right. Don't shut out the light. Don't make the world blind. Don't push that button."

The prosecutor responded to defense counsel's argument by stating: "He told you that it's absurd to talk about life and death, that the law is absurd, that you are playing God, that it's revenge. [¶] And that is to get you, of course, to vote for life without the possibility of parole. Well, death is a legitimate means of punishment in this state. It's available in this state. You are called upon to impose it if you think it's appropriate. You are a cross section of the community. People are judged by a jury of their peers. You make that determination whether the defendant should get the death penalty or life without the possibility of parole. The defense wants to make that burdensome for you. [']Each and everyone [sic] of you from here on must live with that decision. Push that button over there. You must live with that decision for the rest of your life.['] [¶] Well if it wasn't you called upon to carry out the will of the People of the State of California, would have been another jury, because that's our system. That's how the law is affected in this state. [¶] Don't once think that you have to feel burdened and depressed because I voted for death. You are doing what the law says if it's substantial, the aggravation substantially outweighs the mitigation. Don't listen to this lawyer talk. . . ."

"Mr. Applebaum says don't play God. Let every person be in subjection to the governing authorities for there is no authority except from God and those

which are established by God. Therefore, he who resists authority has opposed the ordinance of God, and they who have opposed will receive condemnations upon themselves for rulers are not a cause of fear for good behavior, but for evil. Do you want to have no fear or authority? Do what is good and you will have praise for the same for it is a minister of God to you for good. But if you do what is evil, be afraid for it does not bear the sword for nothing for it is a minister of God an Avenger who brings wrath upon one who practices evil. [¶] You are not playing God. You are doing what God says. This might be the only opportunity to wake him up. God will destroy the body to save the soul. Make him get himself right. . . . [¶] . . . Let him have the opportunity to get his soul right. That's the only way to get his attention. You are not playing God. God ordains authority."

 Defendant asserts that the material in the previous paragraph was a paraphrase of Romans 13:1-7 and that such reliance on biblical authority to advocate imposition of the death penalty is improper. We agree.

The People seek to justify the argument as having been appropriate rebuttal to defense counsel's argument. While the question is close, we are of the opinion that the prosecutor's argument crossed the line of permissible argument and rebuttal. There are situations in which the prosecutor has been allowed to make comments in rebuttal that would otherwise be improper, when such comments are fairly responsive to the argument of defense counsel. (See *People* v. *McDaniel* (1976) 16 Cal.3d 156, 177 [127 Cal.Rptr. 467, 545 P.2d 843] and *People* v. *Hill* (1967) 66 Cal.2d 536, 560 [58 Cal.Rptr. 340, 426 P.2d 908]; see also *United States* v. *Robinson* (1988) 485 U.S. 25, 31-34 [99 L.Ed.2d 23, 30-33, 108 S.Ct. 864].) This, however, is not such a situation.

Here, the prosecutor paraphrased a passage of the Bible that is commonly understood as providing justification for the imposition of the death penalty. Such argument is improper. "The closing statements of counsel should relate to the law and the facts of the case as each side interprets them." (*People* v. *Hawthorne, ante,* 43, at p. 60 [14 Cal.Rptr.2d 133, 841 P.2d 118].) Though not expressly identified as such, the passage was unmistakably biblical in style and readily recognizable by persons schooled in the Christian religion. The prosecutor "may state matters not in evidence that are common knowledge, or are illustrations drawn from common experience, history, or literature." (*People* v. *Love* (1961) 56 Cal.2d 720, 730 [16 Cal.Rptr. 777, 366 P.2d 33].) He may not, however, invoke higher or other law as a consideration in the jury's sentencing determination. (*Jones* v. *Kemp* (N.D.Ga. 1989) 706 F.Supp. 1534, 1559; *Commonwealth* v. *Chambers* (1991) 528 Pa. 558 [599 A.2d 630, 644].) The argument here was clearly improper by exhorting the jury to consider factors outside section 190.3 in making its penalty determination.

██ Penalty determinations are to be based on the evidence presented by the parties and the legal instructions given by the court. Reference by either party to religious doctrine, commandments or biblical passages tending to undermine that principle is improper. We recognize that the defense must be allowed some latitude in its presentation of mitigating evidence. Nevertheless, we do not understand that latitude to include exhortation of religious canons as a factor weighing against the death penalty. If the defense were to present such argument, it would be subject to objection by the prosecution and possible like-kind argument in rebuttal. (See *United States* v. *Robinson, supra*, 485 U.S. at pp. 31-34 [99 L.Ed.2d at pp. 30-33].) What is objectionable is reliance on religious authority as supporting or opposing the death penalty. The penalty determination is to be made by reliance on the legal instructions given by the court, not by recourse to extraneous authority. (*Jones* v. *Kemp, supra*, 706 F.Supp. 1534, 1559.) We do not mean to rule out all reference to religion or religious figures so long as the reference does not purport to be a religious law or commandment.

██ Though we have found that the argument in this case constituted misconduct, we do not find that it requires reversal of the penalty judgment. The jurors deliberated for four days before indicating that they were split six to six on two counts and five to seven on the other two. After further deliberations the next day, they returned verdicts of life without possibility of parole on three of the counts and death on only one of the counts. Under these circumstances, we find no reasonable possibility that the jury would have reached more favorable verdicts had the misconduct not occurred. (See *People* v. *Brown, supra*, 46 Cal.3d 432, 448-449.) The result is the same under the federal *Chapman* test (*Chapman* v. *California* (1968) 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065]).

### 5. *Jury Deadlock.*

Defendant contends that the trial court coerced the jury's verdict by requiring it to continue deliberating after the jury had declared a deadlock.

The jury retired for its penalty deliberations at 1:10 p.m. on Thursday, March 12, 1987, and deliberated until 2:45 p.m. Deliberations continued at 8:05 a.m. on Friday morning until the court recessed the jury at 11:45 a.m. to allow counsel time to submit argument on the appropriate response to a question submitted by the jury. The jury had been given separate verdict forms for each victim and it asked whether it could find that different penalties are applicable to different counts. On Monday morning, March 16, 1987, the court responded to the jury's question by stating, "you should reach a verdict as to each count if you can." At 8:50 a.m. the jury resumed

deliberations and continued until court was adjourned at 1:30 p.m. Deliberations continued on Tuesday, March 17, for an hour and a half. After deliberating two and a half more hours the next morning, March 18, the jury sent the court a note stating, "We cannot reach a verdict. How do you proceed from this point on, and what would you like us to do?" The court called the jury out and asked the foreman whether there was "any reasonable possibility, and I emphasize the word 'possible' that the jury can arrive at a verdict as to any count given further deliberations, the rereading of any testimony or the answering of any question that I can answer?" The foreman answered, "No. We have discussed that possibility, and we don't believe that we can reach a verdict." The court then asked for the jury division on each count and was told that it was six to six on count 1, six to six on count 2 five to seven on count 3, and five to seven on count 4. The court then polled each juror as to "whether you think there is a reasonable possibility with further deliberations you can arrive at a verdict as to any of the counts," and each juror replied, "No."

In a conference outside the jury's presence, the court indicated that it wanted the jury to spend a little more time and that it would probably declare a mistrial if the jury did not reach a verdict the next day. The court estimated that the jury had deliberated for about three full days and noted that a little more time would not be unreasonable in light of the fact that the trial had lasted five months. The court released the jury for that day with directions to return at 7:45 a.m. the next morning. After further deliberations the next morning, Thursday, March 19, 1987, the jury returned its verdicts of life without possibility of parole as to counts 1, 2 and 3, and a verdict of death as to count 4.

Section 1140 provides: "Except as provided by law, the jury cannot be discharged after the cause is submitted to them until they have agreed upon their verdict and rendered it in open court, unless by consent of both parties, entered upon the minutes, or unless, at the expiration of such time as the court may deem proper, it satisfactorily appears that there is no reasonable probability that the jury can agree."

 "The determination whether there is reasonable probability of agreement rests in the discretion of the trial court. (*People* v. *Miller* (1990) 50 Cal.3d 954, 993 [269 Cal.Rptr. 492, 790 P.2d 1289]; *People* v. *Sheldon* (1989) 48 Cal.3d 935, 959 [258 Cal.Rptr 242, 771 P.2d 1330]; *People* v. *Rodriguez* (1986) 42 Cal.3d 730, 775 [230 Cal.Rptr. 667, 726 P.2d 113]; *People* v. *Rojas* (1975) 15 Cal.3d 540, 546 [125 Cal.Rptr. 357, 542 P.2d 229, 92 A.L.R.3d 1127]; *People* v. *Carter* (1968) 68 Cal.2d 810, 817 [69 Cal.Rptr. 297, 442 P.2d 353].) The court must exercise its power, however,

without coercion of the jury, so as to avoid displacing the jury's independent judgment 'in favor of considerations of compromise and expediency.' (*People* v. *Carter*, *supra*, 68 Cal.2d at p. 817.)" (*People* v. *Breaux* (1991) 1 Cal.4th 281, 319 [3 Cal.Rptr.2d 81, 821 P.2d 585].) The question of coercion is necessarily dependent on the facts and circumstances of each case. (*Ibid.*)

██ Defendant argues that the length of time the jury had been deliberating demonstrates that the jury had given careful consideration to the evidence and that a mistrial would have been warranted. (Compare *People* v. *Rich*, *supra*, 45 Cal.3d 1036, 1117 [court declined to declare mistrial on penalty after jury declared itself unable to reach verdict following only one hour of deliberation].) Defendant also cites the virtually even split and the jurors' individual statements against the usefulness of further deliberations as indicating that the court should have declared a mistrial. None of these factors, however, removed the court's discretion to require further deliberations. The jury had deliberated a similar amount of time in *People* v. *Breaux*, *supra*, 1 Cal.4th 281, 317-320, when it was asked to continue even though all of the jurors were negative on the prospects of a verdict. In *People* v. *Rodriguez*, *supra*, 42 Cal.3d 730, 774-777, we found no abuse of discretion in requiring the jury to continue deliberating after it declared itself unable to reach a verdict following 18 days of deliberation.

As further evidence of his claim that the verdict was coerced, defendant points to the facts that the order to continue deliberations was unaccompanied by further explanation and that the verdicts were reached shortly thereafter. The form of the verdicts—three for life and one for death—is also cited as evidence of "considerations of compromise and expediency" (*People* v. *Carter*, *supra*, 68 Cal.2d at p. 817) rather than independent judgment. We are not persuaded. Other explanations for the difference in the verdicts are readily apparent. The jury may have felt that only one death verdict was necessary and that the killing of Marlene Wells was most egregious since she had had no involvement with defendant. Thus the difference in the verdicts may be explained by the difference in the circumstances of the crimes. Defendant's assertion that the verdicts should have been uniform is based on the incorrect premise that the aggravating and mitigating circumstances were the same as to each count. They were not. Each murder had its own set of circumstances, which qualified for consideration under factor (a) of section 190.3.

Nothing in the record suggests that the jury was coerced in any way. The court made no statements that could be interpreted as exerting pressure on any juror. The court viewed the jury as a responsible group that took its duty seriously. The court was not unreasonable in concluding that, in light of the

fact that the trial itself had taken some five months, the jury should put in a little more time than the fourteen and one-quarter hours it had deliberated up to that point. The record shows no abuse of discretion.

6. *Separate Verdict Forms.*

■ Defendant contends that the trial court erred in requiring the jury to return a separate penalty verdict as to each murder victim. Defendant argues that the multiple verdicts obscured the overriding constitutional value of reaching a comprehensive determination of the appropriateness of the death penalty considering all aggravating and mitigating circumstances and invited compromise verdicts. He also claims that the multiple penalty verdicts placed undue emphasis on the characteristics and status of the individual victims, relying on *Booth* v. *Maryland, supra,* 482 U.S. 496 and *South Carolina* v. *Gathers, supra,* 490 U.S. 805. We are not convinced.

A defendant who kills more than one person may be convicted and punished for each murder. (*People* v. *Andrews* (1989) 49 Cal.3d 200, 225 [260 Cal.Rptr. 583, 776 P.2d 285]; *People* v. *Ramos* (1982) 30 Cal.3d 553, 587 [180 Cal.Rptr. 266, 639 P.2d 908].) Separate penalty verdicts have been returned in other capital cases. The defendant in *People* v. *Bittaker* (1989) 48 Cal.3d 1046 [259 Cal.Rptr. 630, 774 P.2d 659] was convicted of first degree murder of five victims and was given separate death verdicts as to each murder victim. (*Id.* at pp. 1106, 1110, fn. 34.) Likewise, the defendant in *People* v. *Mattson* (1990) 50 Cal.3d 826 [268 Cal.Rptr. 802, 789 P.2d 983], who was convicted of the first degree murder of two girls, was given a separate verdict of death as to each murder victim. (*Id.* at p. 838.) We are not persuaded that there is any impropriety in requiring the jury to return a separate penalty verdict for each capital murder count.

7. *Standard for Imposition of Death.*

■ The court gave CALJIC No. 8.84.2 (1986 rev.) on the standards for determining the penalty verdicts. Defendant objects to the following language in that instruction: "To return a judgment of death, each of you must be persuaded that the aggravating factors are so substantial in comparison with the mitigating factors that it warrants death instead of life in prison without parole." Defendant complains that the instruction did not inform the jury that a necessary condition for imposition of the death penalty is a finding that aggravation outweighs mitigation rather than merely being "so substantial in comparison."

We rejected a similar challenge to this language in *People* v. *Breaux, supra,* 1 Cal.4th at pages 315-316. There, as in this case, the language in

question was preceded by instructions that provide: "The weighing of aggravating and mitigating factors does not mean a mere mechanical counting of factors on each side of an imaginary scale, or the arbitrary assignment of weights to any of them. You are free to assign whatever moral or sympathetic value you deem appropriate to each and all of the various factors you are permitted to consider. In weighing the various . . . factors you determine under the relevant evidence which penalty is justified and appropriate by considering the totality of aggravating factors with the totality of the mitigating factors." The instructions given, in our view, were sufficient to inform the jury that it could return a death verdict only if the aggravating circumstances outweighed the mitigating circumstances.

### 8. *Cumulative Error.*

Defendant contends that the cumulative effect of errors during the penalty phase trial requires reversal of the penalty. Since we have found only one error in the penalty phase, there is no cumulative effect.

### CONCLUSION

The judgment is affirmed.

Lucas, C. J., Kennard, J., Arabian, J., Baxter, J., and George, J., concurred.

**MOSK, J.,** Concurring and Dissenting.—I concur in the judgment as to guilt, death eligibility, and noncapital sentence. After review, no error or other defect is evident requiring reversal or vacation on any of these issues.

I dissent, however, from the judgment as to the sentence of death. As will appear, there was prejudicial prosecutorial misconduct bearing on this question.

### I

In summation at the penalty phase, defense counsel urged the jury to fix the penalty for defendant at life imprisonment without possibility of parole.

By contrast, the prosecutor asked for death. In the course of his argument, he made the following comments.

"I want to respond to some of the things argued by [defense counsel]. He told you that it's absurd to talk about life and death, that the law is absurd, that you are playing God, that it's revenge.

"And that is to get you, of course, to vote for life without the possibility of parole. Well, death is a legitimate means of punishment in this state. It's available in this state. You are called upon to impose it if you think it's appropriate. You are a cross section of the community. People are judged by a jury of their peers. You make that determination whether the defendant should get the death penalty or life without the possibility of parole. The defense wants to make that burdensome for you. [']Each and everyone [*sic*] of you from here on must live with that decision. Push that button over there. You must live with that decision for the rest of your life.[']

"Well, if it wasn't you called upon to carry out the will of the people of the State of California, would have been another jury, because that's our system. That's how the law is affected in this state.

"Don't once think that you have to feel burdened and depressed because I voted for death. You are doing what the law says if it's substantial, the aggravation substantially outweighs the mitigation. Don't listen to this lawyer talk.

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Defense counsel] says don't play God. [']Let every person be in subjection to the governing authorities for there is no authority except from God and those which are established by God. Therefore, he who resists authority has opposed the ordinance of God, and they who have opposed will receive condemnations upon themselves for rulers are not a cause of fear for good behavior, but for evil. Do you want to have no fear of authority? Do what is good and you will have praise for the same for it is a minister of God to you for good. But if you do what is evil, be afraid for it does not bear the sword for nothing for it is a minister of God an avenger who brings wrath upon one who practices evil.[']

"You are not playing God. You are doing what God says. This might be the only opportunity to wake him up. God will destroy the body to save the soul. Make him get himself right. . . .

". . . . . . . . . . . . . . . . . . . . . . . . . . . .

". . . Let him have the opportunity to get his soul right. That's the only way to get his attention. You are not playing God. God ordains authority."

At this point, defense counsel objected and asked to approach the bench, but met with summary denial.

## II

"It is of course misconduct for a prosecutor to invoke purported religious law in support of the imposition of the penalty of death." (*People* v. *Hill* (1992) 3 Cal.4th 959, 1016 [13 Cal.Rptr.2d 475, 839 P.2d 984] (conc. opn. of Mosk, J.); accord, *People* v. *Wrest* (1992) 3 Cal.4th 1088, 1107 [13 Cal.Rptr.2d 511, 839 P.2d 1020].)

"Argument of this sort by a representative of the government offends California statutes and judicial decisions, which establish the positive, secular law of this state as the rule governing the choice between life and death (see *People* v. *Mincey* (1992) 2 Cal.4th 408, 483-484 [6 Cal.Rptr.2d 822, 827 P.2d 388] (conc. & dis. opn. of Mosk, J.)). It also violates the United States and California Constitutions—including their respective clauses concerning establishment of religion (U.S. Const., Amend. I; Cal. Const., art. I, § 4), cruel and unusual punishments (U.S. Const., Amend. VIII; Cal. Const., art. I, § 17), and due process of law (U.S. Const., Amend. XIV; Cal. Const., art. I, § 15)." (*People* v. *Hill, supra,* 3 Cal.4th at pp. 1016-1017 (conc. opn. of Mosk, J.); see also *People* v. *Wrest, supra,* 3 Cal.4th at p. 1107 [holding that "such an argument tends to diminish the jury's sense of responsibility for its verdict and to imply that another, higher law should be applied in capital cases, displacing the law in the court's instructions"].)

"It is well settled that religion may not play a role in the sentencing process." (*Jones* v. *Kemp* (N.D.Ga. 1989) 706 F.Supp. 1534, 1559; accord, *People* v. *Mincey* (1992) 2 Cal.4th 408, 485 [6 Cal.Rptr.2d 822, 827 P.2d 388] (conc. & dis. opn. of Mosk, J.); see *People* v. *Wrest, supra,* 3 Cal.4th at p. 1107.)

The jury has "a duty to apply the law of the [jurisdiction] as given by the trial judge, not its own interpretation of the law or its own interpretation of precepts of the Bible, in determining whether the [defendant] should live or die." (*Jones* v. *Kemp, supra,* 706 F.Supp. at p. 1559; accord, *People* v. *Mincey, supra,* 2 Cal.4th at p. 485 (conc. & dis. opn. of Mosk, J.); see *People* v. *Wrest, supra,* 3 Cal.4th at p. 1107.)

The invocation of "the command of extrajudicial 'law' from any source other than the trial judge, no matter how well intentioned, is not permitted." (*Jones* v. *Kemp, supra,* 706 F.Supp. at p. 1559; accord, *People* v. *Mincey, supra,* 2 Cal.4th at p. 485 (conc. & dis. opn. of Mosk, J.); see *People* v. *Wrest, supra,* 3 Cal.4th at p. 1107.)

Indeed, the "use . . . of an extrajudicial code . . . cannot be reconciled with the Eighth Amendment's requirement that any decision to impose death

must be the result of discretion which is carefully and narrowly channelled and circumscribed by the secular law of the jurisdiction." (*Jones* v. *Kemp, supra*, 706 F.Supp. at p. 1559; accord, *People* v. *Mincey, supra*, 2 Cal.4th at p. 485 (conc. & dis. opn. of Mosk, J.); see *People* v. *Wrest, supra*, 3 Cal.4th at p. 1107.)

The Bible, of course, is just such an extrajudicial code. (*People* v. *Mincey, supra*, 2 Cal.4th at p. 483 (conc. & dis. opn. of Mosk, J.); *Jones* v. *Kemp, supra*, 706 F.Supp. at p. 1559.) Its commands and prohibitions cannot be viewed as mere reliquiae of a culture separated from ours by thousands of miles and thousands of years. This is because "[t]o the average juror, . . . the Bible is an authoritative religious document . . . ." (*Jones* v. *Kemp, supra*, at p. 1559; accord, *People* v. *Mincey, supra*, at pp. 483-484 (conc. & dis. opn. of Mosk, J.).)

It is also misconduct for a prosecutor to seek to "minimize the jury's sense of responsibility for determining the appropriateness of death." (*Caldwell* v. *Mississippi* (1985) 472 U.S. 320, 341 [86 L.Ed.2d 231, 247, 105 S.Ct. 2633]; accord, *People* v. *Wrest, supra*, 3 Cal.4th at p. 1107.) "[U]nder the Eighth Amendment 'the qualitative difference of death from all other punishments requires a correspondingly greater degree of scrutiny of the capital sentencing determination.' " (*Caldwell* v. *Mississippi, supra*, at p. 329 [86 L.Ed.2d at p. 239], quoting *California* v. *Ramos* (1983) 463 U.S. 992, 998-999 [77 L.Ed.2d 1171, 1178-1179, 103 S.Ct. 3446].) The assumption underlying Eighth Amendment jurisprudence is that "a capital sentencing jury recognizes the gravity of its task and proceeds with the appropriate awareness of its 'truly awesome responsibility.' " (*Caldwell* v. *Mississippi, supra*, at p. 341 [86 L.Ed.2d at p. 247].) This premise is threatened when a representative of the government attempts to undermine the jurors' proper attitude and approach.

It hardly needs mention that "[a] prosecutor is held to a standard higher than that imposed on other attorneys because of the unique function he or she performs in representing the interests, and in exercising the sovereign power, of the State." (*People* v. *Espinoza* (1992) 3 Cal.4th 806, 820 [12 Cal.Rptr.2d 682, 838 P.2d 204].)[1]

### III

On the very face of the record, prosecutorial misconduct is manifest.

---

[1]Because the issue is not raised in this case, I do not attempt to define "religious" misconduct *by defense counsel*. Certainly, the task would require some delicacy. For example, the provisions of the United States and California Constitutions that constrain the prosecution in this regard—including the clauses concerning establishment of religion (U.S. Const., Amend. I; Cal. Const., art. I, § 4), cruel and unusual punishments (U.S. Const., Amend. VIII; Cal. Const., art. I, § 17), and due process of law (U.S. Const., Amend. XIV; Cal. Const., art. I, § 15)—are generally inapplicable to the defense. (But see Cal. Const., art. I, § 29 ["In a

To begin with, the prosecutor invoked purported religious law in support of the imposition of the penalty of death. That is indisputable.

As noted, the prosecutor stated: "[Defense counsel] says don't play God. [']Let every person be in subjection to the governing authorities for there is no authority except from God and those which are established by God. Therefore, he who resists authority has opposed the ordinance of God, and they who have opposed will receive condemnations upon themselves for rulers are not a cause of fear for good behavior, but for evil. Do you want to have no fear of authority? Do what is good and you will have praise for the same for it is a minister of God to you for good. But if you do what is evil, be afraid for it does not bear the sword for nothing for it is a minister of God an avenger who brings wrath upon one who practices evil.['] [¶] You are not playing God. You are doing what God says. This might be the only opportunity to wake him up. God will destroy the body to save the soul. Make him get himself right." The prosecutor returned to the point: "Let him have the opportunity to get his soul right. That's the only way to get his attention. You are not playing God. God ordains authority."

In a word, the "rule of decision" that the prosecutor urged the jury to apply was assertedly religious. He cited the Bible to the jurors. To be sure, he did not expressly identify the relevant passage—which is Romans 13:1-4—as biblical in source and in substance. No such identification was required. There is no reasonable likelihood that the jury understood the words to be anything other than what they were.

Further, the "purpose of punishment" that the prosecutor called on the jury to serve was assertedly religious as well. He exhorted the jurors to destroy defendant's corruptible body in order to save his immortal soul.[2]

---

criminal case, the people of the State of California have the right to due process of law . . . ."].) I leave this labor to another day. The majority should do so as well. They purport to distinguish between permissible references to "religion" and impermissible references to "religious law." Their "rule" may be suitable for sophists to debate in rhetorical exercises. It is altogether too vague for the bench and bar to apply in criminal trials.

[2]In accord with above analysis is *Commonwealth* v. *Chambers* (1991) 528 Pa. 558 [599 A.2d 630]. There, the Pennsylvania Supreme Court considered a claim of prosecutorial misconduct based on comments that "Karl Chambers has taken a life" and "As the Bible says, 'and the murderer shall be put to death.' " It found the point meritorious. Its reasoning was as follows.

"In the past we have narrowly tolerated references to the Bible and have characterized such references as on the limits of 'oratorical flair' and have cautioned that such references are a dangerous practice which we strongly discourage. *Commonwealth* v. *Henry*, 524 Pa. 135, 569 A.2d 929 (1990); *Commonwealth* v. *Whitney*, 511 Pa. 232, 512 A.2d 1152 (1986). We now admonish all prosecutors that reliance in any manner upon the Bible or any other religious

The majority rightly conclude that the prosecutor's impropriety cannot be justified or even excused as "fairly responsive" to comments in defense counsel's summation. True, the prosecutor asserted that he "want[ed] to respond to some of the things argued by [defense counsel]." But there was nothing "fairly responsive" about what he would soon say. Perhaps the matter would have been different if counsel had declared or even suggested that the death penalty was inappropriate under some religious law. He had not done so. Notwithstanding his utterance of the word "God" and his reference to *lex talionis*, his argument was altogether secular—to the effect that the jurors each held an absolute power of life and death over defendant; that they should reject death as empty vengeance; and that they should choose life to vindicate what is good in human beings and human society.

More important, even a "fair response" of this kind by a prosecutor would be altogether impermissible. It is plain from the analysis set out above that the government is prohibited from interjecting religion into the sentencing process. The prosecutor is its representative. The bar that constrains the principal constrains the agent as well.

In addition, the prosecutor sought to minimize the jury's sense of responsibility for determining the appropriateness of death. That too is indisputable.

As noted, the prosecutor stated: "The defense wants to make [the penalty determination] burdensome for you. [']Each and everyone [*sic*] of you from here on must live with that decision. Push that button over there. You must live with that decision for the rest of your life.['] [¶] Well, if it wasn't you called upon to carry out the will of the people of the State of California,

writing in support of the imposition of a penalty of death is reversible error per se and may subject violators to disciplinary action.

"Here, the prosecutor argued, 'As the Bible says, "and the murderer shall be put to death." ' This reference is substantially different than the references tolerated in *Henry* and *Whitney* where the prosecutor allegorically likened the Defendant to the Prince of Darkness mentioned in the Bible to establish that he was an evil person.

"More than allegorical reference, this argument by the prosecutor advocates to the jury that an independent source of law exists for the conclusion that the death penalty is the appropriate punishment for [Chambers]. By arguing that the Bible dogmatically commands that 'the murderer shall be put to death,' the prosecutor interjected religious law as an additional factor for the jury's consideration which neither flows from the evidence or any legitimate inference to be drawn therefrom. We believe that such an argument is a deliberate attempt to destroy the objectivity and impartiality of the jury which cannot be cured and which we will not countenance. Our courts are not ecclesiastical courts and, therefore, there is no reason to refer to religious rules or commandments to support the imposition of a death penalty.

"Our Legislature has enacted a Death Penalty Statute which carefully categorizes all the factors that a jury should consider in determining whether the death penalty is an appropriate punishment and, if a penalty of death is meted out by a jury, it must be because the jury was satisfied that the substantive law of the Commonwealth requires its imposition, not because of some other source of law." (*Commonwealth* v. *Chambers, supra*, 528 Pa. at pp. 586-587 [599 A.2d at p. 644].)

would have been another jury, because that's our system. That's how the law is affected in this state. [¶] Don't once think that you have to feel burdened and depressed because I voted for death. You are doing what the law says if it's substantial, the aggravation substantially outweighs the mitigation. Don't listen to this lawyer talk."

The prosecutor's impropriety in this regard cannot seriously be denied. Indeed, the majority's efforts here are totally nonexistent—and that in spite of the fact that defendant expressly raised the claim in his briefing before this court.

I now turn from the fact of the prosecutor's misconduct to its consequence.

It is the general rule for error under California law that reversal requires prejudice (*People* v. *Gordon* (1990) 50 Cal.3d 1223, 1253 [270 Cal.Rptr. 451, 792 P.2d 251]) and prejudice in turn requires a reasonable possibility of an effect on the outcome when, as here, penalty in a capital trial is involved (*People* v. *Brown* (1988) 46 Cal.3d 432, 446-448 [250 Cal.Rptr. 604, 758 P.2d 1135]).

Similarly, it is the general rule for error under the United States Constitution that reversal requires prejudice and prejudice in turn is presumed unless the government shows that the failing was harmless beyond a reasonable doubt. (See, e.g., *Rose* v. *Clark* (1986) 478 U.S. 570, 576-579 [92 L.Ed.2d 460, 469-471, 106 S.Ct. 3101].)

The prosecutor's misconduct implicates both California law and the United States Constitution. It appears to be subject to the general rule of harmless-error analysis. Thus, insofar as state law is concerned, the "reasonable possibility" standard is applied. Insofar as the federal charter is involved, the "reasonable doubt" test is employed.

The prosecutor's misconduct went to the first, last, and only issue before the jury in the penalty phase of this capital trial, viz., whether they were to take or spare defendant's life. The evidence in aggravation was not insubstantial. But not insubstantial too was the evidence in mitigation.

The prosecutor's attempt to minimize the jury's responsibility cannot be deemed unsuccessful. "A capital sentencing jury is made up of individuals placed in a very unfamiliar situation and called on to make a very difficult and uncomfortable choice. They are confronted with evidence and argument on the issue of whether another should die, and they are asked to decide that

issue on behalf of the community. Moreover, they are given only partial guidance as to how their judgment should be exercised, leaving them with substantial discretion." (*Caldwell* v. *Mississippi, supra,* 472 U.S. at p. 333 [86 L.Ed.2d at p. 242].) Comments like those of the prosecutor in this case offered the jurors an easy way to avoid a hard choice—in fact, an especially hard choice, to judge from the relatively close balance of aggravation and mitigation at the penalty phase and the labored progress of the deliberations thereafter.

Perhaps more significant, the prosecutor's argument from purported religious law must have carried special force, incorporating as it did "what many consider an authoritative source—if not Authority Itself." (*People* v. *Mincey, supra,* 2 Cal.4th at p. 487 (conc. & dis. opn. of Mosk, J.).)

I acknowledge that the jury did not return its verdict of death immediately after the prosecutor's misconduct and that it also returned three verdicts of life. "That fact means only that [the] impropriety did not instantly [and totally] determine the outcome. It simply does not suggest that it was without improper influence." (*People* v. *Mincey, supra,* 2 Cal.4th at p. 487 (conc. & dis. opn. of Mosk, J.).) The majority appear to assume that the force of the impropriety was dissipated in the course of deliberations. A contrary assumption, however, seems more reasonable on this record: the impropriety's force actually determined the course of deliberations and thereby prevented four early verdicts of life.[3]

In sum, the misconduct raises a reasonable possibility of an adverse effect on the outcome, and cannot be deemed harmless beyond a reasonable doubt.

IV

For the reasons stated above, I would set aside the sentence of death.

Appellant's petition for a rehearing was denied February 10, 1993, and the opinion was modified to read as printed above. Mosk, J., was of the opinion that the petition should be granted.

---

[3]In accord on this point as well is *Commonwealth* v. *Chambers, supra,* 528 Pa. 558 [599 A.2d 630]. As noted, the Pennsylvania Supreme Court in that case held meritorious a claim of prosecutorial misconduct based on the comments that "Karl Chambers has taken a life" and "As the Bible says, 'and the murderer shall be put to death.'" (See fn. 2, *ante*.) "Because the prosecutor's argument in favor of the death penalty reached outside of the evidence of the case and the law of this Commonwealth," concluded the court, "we are not convinced that the penalty was not the product of passion, prejudice or an arbitrary factor and, therefore, pursuant to our Death Penalty Statute, we must vacate the sentence of death . . . ." (528 Pa. at p. 587 [599 A.2d at p. 644].)