Filed 9/19/14  P. v. Kenniston CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>KEVIN ALLEN KENNISTON,<br><br>    Defendant and Appellant. | D063901<br><br><br>(Super. Ct. No. SCS247814) |

APPEAL from a judgment of the Superior Court of San Diego County, Esteban Hernandez, Judge.  Affirmed.

Thomas Owen, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Julie L. Garland, Assistant Attorney General, Eric A. Swenson, Lynne G. McGinnis and Kristine A. Gutierrez, Deputy Attorneys General, for Plaintiff and Respondent.

In May 2011, a grand jury issued a 32-count indictment against defendant and appellant Kevin Allen Kenniston charging him as follows: kidnapping (Pen. Code,[1] § 207, subd. (a); count 1); false imprisonment to avoid arrest (§§ 236 & 210.5; count 2); attempting to dissuade a witness from reporting a crime (§ 136.1, subd. (b)(1); count 3); false imprisonment by violence, menace, fraud or deceit (§§ 236 & 237, subd. (a); count 4); battery of a significant other (§ 243, subd. (e)(1); count 5); petty theft with three priors (§ 484; count 6); 11 counts of impersonating an officer and detaining another (§ 146a, subd. (b)(1) & (2); counts 7-13, 15, 17, 20 & 22); five counts of cruelty to a child (§ 273a, subd. (b); counts 14, 16, 19, 21 & 32); child abuse (§ 273a, subd. (a); count 18); stalking with a restraining order in effect (§ 646.9, subd. (b); count 23); four counts of violation of a protective order (§ 166, subd. (c)(1); counts 24, 26, 28 & 30); and four counts of disobeying a court order (§ 273.6, subd. (a); counts 25, 27, 29 & 31).

It was further alleged in counts 7-13, 15, 17, 20 and 22 that defendant willfully wore, exhibited or used a badge or insignia that falsely purported to be authorized for use by a peace officer (§ 538d); and that the offense in count 23 was committed while defendant was released from custody on bail (§ 12022.1, subd. (b)).  It was also alleged that defendant had four prison priors (§§ 667.5, subd. (b) & 688) and that he was ineligible for probation (§ 1203, subd. (e)(4)).

Counts 11, 24 and 25 were dismissed before trial.  Count 12 was dismissed by the prosecution during trial.  The jury in November 2012 found defendant guilty of counts 1-6, 8, 10, 15, 16, 18-23 and 26-29 and made true findings that defendant fraudulently

---

[1]  All further statutory references are to the Penal Code unless otherwise indicated.

impersonated a peace officer in counts 8, 10, 15, 20 and 22 and that he committed the offense in count 23 while released from custody on bail. The jury found defendant not guilty of counts 7, 9, 13, 14, 17 and 30-32. After defendant admitted the truth of the prison prior allegations, the court sentenced him to total term of 23 years four months in state prison.

Defendant contends the trial court abused its discretion when it denied his motion to sever counts 1 and 2, involving defendant's ex-wife Esmeralda Mendez (Mendez counts), from counts 3-6, 23, and 26-32, involving defendant's former girlfriend, Jessica G. (Jessica G. counts), and to sever both the Mendez counts and the Jessica G. counts, on the one hand, from counts 7-10, and 12-22 (impersonation/child endangerment counts), on the other hand.

Defendant also contends the court abused its discretion when it denied his request on the date set for trial to substitute in new counsel, who had responded to an ad on the internet placed by defendant's friend, after defendant's trial already had been continued at least seven times. Finally, defendant contends that the prosecutor committed prejudicial misconduct when he made four separate references to the grand jury during the trial and that defense counsel was ineffective for not objecting to at least two such references. As we explain, we reject each contention and affirm the judgment of conviction.

## FACTUAL AND PROCEDURAL BACKGROUND[2]

A. *Mendez Counts*

Mendez testified she was 20 years old when she and defendant met in 2007. Mendez was then living with her parents. When they met, defendant told Mendez he owned his own "transportation company" and worked for the "government," although defendant told Mendez he was prohibited from giving her more specifics about his governmental work. About a month and a half after they met, Mendez and defendant became engaged. They married shortly thereafter and resided together in an apartment in Oceanside, California.

A few weeks later, Mendez became aware that the diamond in the wedding ring defendant had given her was fake. This caused Mendez to become suspicious of defendant because he previously had told her the diamond was real. Mendez confronted defendant about the diamond and about other things defendant had said, including that he owned his own home. Defendant initially insisted the diamond was real but subsequently admitted it was fake. When Mendez asked about the home defendant said he owned and asked to see it, defendant told Mendez he was selling it and did not have a key.

Just a few weeks after they began living together as a married couple, Mendez moved back to her parent's home because she and defendant were arguing. Mendez

---

[2] Although defendant does not challenge the sufficiency of the evidence in the record in support of his conviction, we nonetheless view that evidence in the light most favorable to the judgment. (See *People v. Osband* (1996) 13 Cal.4th 622, 690.) Portions of the factual and procedural history related to the contentions raised by defendant are discussed *post*.

subsequently moved back in with defendant. After she returned, defendant became physically abusive.

Mendez testified about an incident that occurred after they had argued. Defendant initially refused to let her leave their apartment or call her parents on her cell phone, which he disabled. Defendant next pushed Mendez up against the bedroom wall, put both of his hands around her neck and choked her for about 30 seconds. He also grabbed Mendez by the ankles a "couple of times" when she was on the bed and pulled her down to the floor.

Defendant then went to the kitchen, retrieved a "steak knife" and pointed it at Mendez. Mendez testified defendant then got on top of, and wrapped his legs around, her. Mendez asked defendant, "'Are you going to kill me or what are you going to do?'" and "'Really? Are you really going to do this?'" Mendez was afraid defendant would stab her. Defendant responded, "'You don't think I will?'" Scared, Mendez tried to be "nice" to defendant so that he would let her go. Defendant, in response, stabbed the pillow twice, missing Mendez's head by a "couple inches."

After defendant got off of Mendez, she ran to a neighbor's house and asked them to call police. While at the neighbors, she saw defendant outside letting the air out of her car tires. Mendez ran back to the apartment and tried to lock the door behind her. Defendant followed behind and pushed the door open.

When Mendez told defendant the police had been called, he said, "Let's go." Defendant then grabbed Mendez by the arm, walked her outside and forced her into his car. Mendez testified she was scared.

5

Defendant would not tell Mendez where they were going as he drove. Mendez repeatedly asked defendant to let her go. Finally, Mendez told defendant that if he let her go, she would not press charges against him. According to Mendez, defendant's demeanor then changed and he allowed Mendez to use his cell phone.

Mendez's sister met Mendez and defendant in a parking lot. Mendez's sister then drove Mendez to their parents' home, where Mendez took pictures of the bruises to her neck, arms and knees she received during the incident.

Mendez testified defendant called the following day to apologize and to ask her to come home. Mendez refused. A few weeks later, defendant went to Mendez's parents' house, again apologized and asked Mendez to come home with him. While there, defendant found Mendez's cell phone and deleted the pictures she had taken of her bruises from the steak knife incident. Mendez was very upset when she discovered her pictures were gone.

About two weeks later, Mendez returned to defendant. Although Mendez was cautious when she moved back into their apartment, she believed defendant had changed because he was being "really nice and sweet." However, when Mendez heard a voicemail on defendant's phone from another woman, Mendez concluded defendant was cheating on her and asked for a divorce.

Mendez testified in early May 2007 defendant came to her parents' home with divorce papers for her to sign. Mendez's mother was home with Mendez at the time. After Mendez signed the papers, she went upstairs to get ready for work, believing defendant had left. While in the shower, defendant came into her bathroom, opened the

6

shower curtain and struck Mendez in the face and chest while accusing her of cheating on him. Defendant then threw Mendez's car keys at her, striking her on the arm.

When police arrived, they took pictures of Mendez's face, which was red from the blows from defendant, and of her arm, which was scratched from the keys. The next day, Mendez sought to obtain a restraining order against defendant.

In support of the restraining order, Mendez described not only the shower incident but also an incident involving defendant that occurred in late April 2007. In the latter incident, Mendez had agreed to meet defendant at a fitness club after work. After exercising, Mendez stopped at a convenience store. When she came out of the store, defendant had used his car to block Mendez's car from leaving. Defendant then started yelling, "Where were you?" When Mendez replied she had been inside the store the entire time, defendant accused her of lying and of using the payphone outside the store to call another man. Defendant then jumped onto the hood of Mendez's car, stomped on the windshield and shattered the glass while Mendez was inside.

A patrol officer testified he responded to a call in late April 2007 about 12:30 a.m. involving a family disturbance at a convenience store. The officer spoke to Mendez. His report confirmed the events Mendez described in support of her restraining order. The officer also testified Mendez said she did not want to press charges against defendant.

Despite the temporary restraining order, defendant called Mendez several times, including the "whole week" before defendant's scheduled court date resulting from the May 2007 shower incident. During one of those calls, defendant asked Mendez to go to court with him and testify that defendant had not hit her in the shower, as she had previously claimed. Mendez refused.

7

Mendez testified the restraining order did not stop defendant thereafter from continuing to contact her, including coming to her place of employment. Defendant complained to Mendez it was her fault he had to pay "fees" and take "anger management classes" as a result of the May 2007 shower incident.[3]

B. *Jessica G. Counts*

Jessica G. testified she met defendant in April 2010. In the beginning of their relationship, defendant told Jessica G. and Jessica G.'s then 11-year-old daughter, Kylie, he owned a funeral escort business and, as a result, was authorized to stop traffic to allow a funeral procession to proceed uninterrupted. He also told Jessica G. a "hand[ful] of times" over the course of their relationship that he was a sworn police officer and had taken a course through the California Highway Patrol that authorized him "to stop people and write tickets."

Kylie testified defendant told her that he purchased a black and white car online and that he was allowed to pull people over like the highway patrol. Kylie also testified that defendant's car had roof-mounted lights, a siren and a loudspeaker; that defendant also had a police scanner inside, which he used to speak to other police officers; and that defendant told her he was then known as "the sergeant," and it was not illegal to listen to and talk on the police scanner "if you are a cop."

---

[3] The record shows that as a result of the May 2007 shower incident, defendant plead guilty to misdemeanor battery on a spouse, in violation of section 243, subdivision (e)(1).

Kylie testified defendant told her in the past he had ticketed people. Kylie saw defendant carry a gun when he wore his funeral escort uniform. Defendant told Kylie it was a "real gun."

Kylie testified about various incidents when defendant would pull over other motorists while she was riding as a passenger in his car. In one instance, defendant used the lights on the top of his car to pull over a motorist driving a "blue car" near a shopping center because the motorist, according to Kylie, had either run a stoplight or was going too fast. Defendant talked to the motorist but did not write a ticket because the motorist apologized.

In another incident, defendant used his car's flashing lights to pull over a yellow "sports car" for speeding on a freeway as he was driving Kylie to school. About five minutes later, defendant returned and told Kylie he did not ticket the motorist because he "left his ticket book at home . . . ." Kylie recounted another incident when defendant used his car's flashing lights to pull over a motorist on the freeway. Kylie testified this incident also occurred in the morning when defendant was driving her to school.

Kylie also testified about an incident involving a homeless man. As they were driving on a freeway, defendant said to Kylie, "'watch this.'" Defendant then slowed down and, over the loud speaker, told the homeless man, "'get off of my freeway.'" Kylie testified the man appeared afraid and quickly attempted to gather up his belongings. Defendant then told the man he would buy him a pizza if he picked up trash on the freeway.

Kylie testified about another incident when defendant used his car's flashing lights and siren to block a lane and divert traffic after they exited a freeway and saw a man out

9

of his car looking in some bushes. Defendant pulled up to the man, who claimed to be looking for an item that had flown out of his car window. Defendant helped the man look for the item for about three minutes. When they could not find it, defendant demanded the man "get off the road."

Kylie testified that defendant was wearing his funeral escort uniform in at least one of these incidents and that she was afraid when defendant stopped motorists because a motorist might get angry "and come and try to hurt him or me." On one occasion, Kylie told defendant he could not pull over people because he was not a "real cop." Defendant responded he had the "same powers as a cop."

Jessica G. testified that, shortly before she and defendant stopped dating, Kylie told her about an incident that occurred when defendant had been dropping Kylie off at school. As discussed in more detail *post*, defendant in this particular incident confronted a woman as she sat in her car parked in the school's loading zone. Kylie then told Jessica G. about the other incidents of defendant pulling over motorists when Kylie was a passenger in defendant's car. Jessica G. testified that she was "shocked" to learn her daughter had been in the car with defendant. Jessica G. confronted defendant and told him he was not allowed to pull people over. In response, defendant said, "'Yeah, I can.'"

Jessica G. testified the first incident of physical abuse by defendant occurred in June 2010 when defendant pushed her as he was taking away her cell phone. In another incident of abuse, Jessica G. testified defendant came to her home and wanted to talk. Because Jessica G. had just gotten off work, she got up to make herself a drink. Defendant did not want Jessica G. to drink so defendant "took the booze and . . . poured it out." Jessica G. in response said, "Why d[id] you do that? It is my condo. You can't just

come over here and tell me what to do." Defendant responded by hitting Jessica G. in the solar plexus, knocking the wind out of her.

In another incident of abuse, after they had argued, defendant restrained Jessica G. in her home while Kylie and Kylie's friend were also at home. In this incident, defendant would not let Jessica G. go even though she was trying to get away from him.

Jessica G. testified about an incident that took place in early March 2011 after she and defendant argued. In this incident, defendant put his hands around her neck, after forcing her into a corner, and lifted her off the ground. After defendant calmed down, he let Jessica G. go and said, "'I am sorry. I am sorry. I didn't mean to do that. Let's just talk.'"

During the same general time frame as the March 2011 incident, defendant told Jessica G. he was contemplating leaving San Diego and taking a job as a "mercenary overseas." Defendant told Jessica G. that the job was "somewhere in Africa"; that it was dangerous and there was a "high chance of [him] getting KIA or killed in action"; but that the money was good and it was a good opportunity for him.

On or about March 16, 2011, Jessica G. invited defendant to stop by her home. At some point that evening, Jessica G. unexpectedly received a text from "Brad," an individual she previously had met while playing online video games. Jessica G. opened the message, looked at it and then erased it. When Jessica G. refused to tell defendant who had texted her, defendant took Jessica G.'s phone and left. Defendant later called Jessica G. and told her he had "chucked it [i.e., the phone] off the side of the road." The next day, while upstairs in her home, Jessica G. heard someone come through the front

11

gate into her house and "plop" something on the counter. Jessica G. went downstairs and found the cell phone defendant had taken the night before.

On or about March 18, 2011, Jessica G. came home from work about 2:30 a.m. and found defendant waiting for her in his funeral escort car, which he had parked in front of her carport. Defendant told Jessica G. they needed to talk. Jessica G. reluctantly agreed. After Jessica G. told defendant she did not love him anymore, defendant said he had taken the mercenary job and was leaving the following day for Washington D.C., where he would pick up his "orders" and obtain his itinerary. Defendant returned the keys to Jessica G.'s home and left.

The following day, defendant sent Jessica G. various text messages, including one stating he was in the airplane and was about to take off and another of an aerial photo taken from inside an airplane. Defendant also called Jessica G. and left a message while on the airplane. Jessica G. testified in the message she could hear "airplane noise in the background." Defendant told Jessica G. he would call when he arrived at his hotel in Washington D.C.

On March 20, 2011, defendant sent Jessica G. a text message saying he would consider coming back to San Diego so they could get married and have children. Jessica G. respond defendant was crazy. During the day, defendant sent myriad additional text messages to Jessica G., including one accusing Jessica G. of "video fucking" Brad, one telling Jessica G., "you love only yourself," and another saying she drank too much.

The next day, defendant sent Jessica G. a text message apologizing for his behavior. He told Jessica G. that he would be leaving the following day to go overseas;

12

that he would no longer be able to communicate once he left; and that he would like her to call when she got off work.

Although Jessica G. got off work about 2:30 a.m., she spoke to defendant as she drove home. Once home, they hung up and Jessica G. began playing an online video game with Brad. As she was playing, defendant began to send Jessica G. text messages. When Jessica G. did not respond, defendant sent Jessica G. a message, "Say hi to Brad," and moments thereafter, another message, "for me." When Jessica G. still did not respond, Jessica G.'s landlines starting ringing even though it was after 3:00 a.m. and Kylie was sleeping. Defendant then left a message on Jessica G.'s answering machine that his employer was considering sending him back to San Diego.

A few minutes later, Jessica G. heard a "clicking" noise at the front door. Defendant suddenly came "storming" through her front door, silently approached Jessica G. and then went to her gaming console and turned it off. Believing defendant was in Washington D.C. and was leaving from there to go overseas, Jessica G. testified she was shocked to see defendant and asked him how he got inside her apartment. Defendant told Jessica G. he used his "special forces training" to pick her locks "with twigs."

Defendant next started looking through the text messages on Jessica G.'s cell phone. When Jessica G. tried to take her phone back, defendant grabbed Jessica G. and applied pressure so that she was unable to move her arm. As defendant twisted Jessica G.'s arm, she lost her balance and fell to the floor. Defendant got on top of Jessica G. and used his weight and knees to pin her down as he continued looking through her phone messages. When Jessica G. said she was not doing anything wrong, defendant told Jessica G. to shut up and used the back of his hand to slap Jessica G., grazing her face.

13

Defendant next came across a text message where Brad had called Jessica G. "darling." Defendant leaned forward, got within a few inches of Jessica G.'s face and said, "'Do you know what the word betrayal means?'"

Jessica G.'s cell phone starting ringing. When Jessica G. did not pick up, Brad sent Jessica G. a text message saying he had called the police. Jessica G. remained curled in a ball on the floor as her phone rang again. Despite defendant's demands, Jessica G. refused to answer the phone and say everything was fine.

Shortly thereafter, defendant saw the police outside of Jessica G.'s home. He told Jessica G. he could go to jail unless she told them everything was okay between them. Jessica G. did not respond. Defendant then threatened to destroy Jessica G.'s business and job.

Jessica G. testified defendant tried to be "chummy" with the police when he opened the front door and said, "'Hey, guys. How is it going?'" After speaking to Jessica G., however, the police arrested defendant. The officers later returned three keys to Jessica G. they had found on defendant, including a spare car key and two keys to her home. A few days later, Jessica G. obtained a restraining order against defendant after he was released on bail after being charged with assaulting Jessica G.

In mid-April 2011, with the temporary restraining order still in effect, defendant called Jessica G. and said he wanted to apologize. During their conversation, defendant acknowledged the restraining order prevented him from contacting Jessica G.

Jessica G. testified the following day she saw defendant in his car traveling in the opposite direction. In her rearview mirror, she saw defendant make a U-turn and follow her into a grocery store parking lot. Defendant stopped about 10 to 15 feet from where

14

Jessica G. had parked. Defendant said he wanted to have coffee, "com[e] clean" and tell Jessica G. about his "real past." Jessica G. responded, "'You got to be fucking kidding me.'" Jessica G. called the police.

A police officer testified he and another officer went to defendant's home later that evening, knocked on the door and saw a man in pajamas come downstairs and then go back upstairs. According to the officer, when the same man returned downstairs, he was wearing jeans and tennis shoes. The officers waited outside until they were let into the home by another of its occupants. The officer testified the back door of the home was open, and the man was gone. Jessica G. testified she was scared when police called her at work about 9:30 p.m. that night informing her that defendant had evaded arrest.

Shortly after receiving that call from police, Kylie called Jessica G. and said, "'Mommy, he is here,'" "'He is outside.'" When Jessica G. asked who was outside, Kylie said she thought it was defendant. Kylie was crying and could barely talk. Kylie told her mother she heard knocking on the sliding glass door of their home and then heard the front door "jiggle." Jessica G. told Kylie to hang up and call 911. The phone line then went dead.

Jessica G. testified she was afraid defendant would break into her home and take Kylie hostage. Jessica G. attempted to contact Kylie, but the phone line was busy. Jessica G. called 911. Police arrested defendant the following morning.

15

C. *Impersonation/Child Endangerment Counts*

The record shows defendant was charged in counts 7-10 and 12-22 of impersonating an officer/child endangerment.[4] The record shows Kylie was also riding in defendant's car in connection with count 8, summarized below.

1. *Counts 8 and 13-22*

With respect to count 8, in early March 2011 Lisbeth Figueroa dropped off two of her children at school and then remained in a yellow unloading zone in her car while she talked on her phone. As she sat, she saw in the rearview mirror flashing lights behind her from what appeared to be a police car. She then heard someone say over a loudspeaker, "'Please move your vehicle. This is not a parking zone.'" Figueroa noticed the lights were all yellow even though the car was black and white and looked like a police car.

The driver of the car, later identified as defendant (who was dropping Kylie off at school), again demanded that Figueroa move her car. When she did not move, the man pulled alongside and Figueroa noticed the words "funeral escort" written on the car door. The man told Figueroa the registration tag on her vehicle was expired and either she had to move her car or he would have it towed. The man also demanded Figueroa's driver's license and car registration.

Figueroa explained she had been unable to go to the DMV to renew her car's registration. After Figueroa told the man she worked in security, the man's demeanor changed. He introduced himself as "Kevin" and told Figueroa he had a friend who

---

4    As noted *ante*, counts 11, 24 and 25 were dismissed before trial and count 12 was dismissed during trial.

worked at the DMV who could help Figueroa. Figueroa later reported this incident to the school police officer.

Counts 13-22 charged defendant with impersonating an officer/child endangerment specifically relating to the incidents, summarized *ante*, when Kylie was riding as a passenger in defendant's car.

2. *Counts 9, 10 and 12*

The record shows count 9 charged defendant with impersonating an officer on or about July 16 and 17, 2010 (victim Jessica G.). Defendant was charged in count 10 with impersonating an officer between June and August 2010 (victims Ivan Fernandez and Nichole Ballesteros).[5] Count 12 charged defendant with impersonating an officer in early December 2008 (victim Candice Hodge).

DISCUSSION

I

Severance

Defendant contends the trial court abused its discretion and violated his rights to due process and a fair trial when it refused to sever the Mendez counts from the Jessica G. counts, and when it also refused to sever those counts, on the one hand, from the impersonation/child endangerment counts, on the other hand.

---

[5] The record shows that while driving in June or July 2010, Fernandez accidently cut off whom he believed was a motorcycle officer. The "officer" made a U-turn, turned on a siren and pulled over Fernandez, who had just picked up Ballesteros. The "officer," later identified as defendant, was wearing a uniform, helmet, badge and a belt typically worn by a sworn police officer. The "officer" made Fernandez get out of his car and sit on the curb. The "officer" subsequently let Fernandez go, but, before doing so, made him drive back to Ballesteros's house to apologize to Ballesteros's mother.

17

A. *Trial Court Ruling Denying Severance*

In denying defendant's pretrial motion to sever, the trial court ruled in part as follows:

"Here what we have are what the defense term three separate cases.  Case number one concerns Counts 1 and 2 where the alleged victim is Esmeralda Mendez, events from 2007 allege kidnapping and false imprisonment as counsel has termed it domestic violence.

"Case two is Counts 3 through 6, 23, and 26 through 32 where the alleged victim is Jessica G. as well as Kylie G., the daughter of Jessica.  Alleged disobeying of restraining orders and cruelty of a child, events in 2011.  Similarly, domestic violence related allegations.

"Count 3 -- or case three concerns Counts 7 through 10 and 13 through 22, alleged impersonating of an officer with multiple alleged victims, events from 2010 and 2011.

"Looking at the types of cases, as I have indicated, case number one as well as case number two appear to have the same class of crimes insofar as both are domestic violence related offenses, alleged DV and alleged DV violation of restraining order.  Thus, the same class of crimes.  [¶] . . . [¶]

"Cases one and two also appear to have cross admissible evidence under Evidence Code Section 1109, Subdivision (a)(1).  There is, contrary to the defense position, it would not be simply a two-witness case as against Esmeralda, he said/she said.  But because of 1109, there would be cross admissibility of evidence concerning Jessica G. and other alleged victims of domestic violence such that it would not be a two-witness case.

18

"So in terms of judicial economy, if there were a severance, it would be presenting all that 1109 evidence twice, once for case number one, once for case number two. So judicial economy is not served in that way.

"Also, the Court understands that Evidence Code Section 352 is ultimately an additional consideration when evaluating 1109 evidence, and I will defer that until a further discussion momentarily.

"Looking at what we have here between cases one and two is four-year gap between 2007 and 2011. That does not appear to be too great of a distance, given that both are of the same class of domestic violence conflict and both appear to be of the same amount of alleged violence, this does not appear to be a situation where . . . one case is grossly violent and the other comparatively benign. The level of alleged violence in both appears to be on par.

"Now, balancing the prejudice versus the probative value under [Evidence Code section] 352, the Court has examined the prejudice versus the probative value and finds that it would be more probative than prejudicial. And, again, I will go through some additional factors momentarily.

"Looking at cases two and three, while false impersonation is not the same class, they do appear to be connected in their commission insofar as Kylie G. was present, as I believe counsel indicated, in five out of the eight alleged instances of impersonating an officer, the same Kylie G. that is connected with case two. The percipient witness to quite a few of these events.

"So, it's the first prong of Penal Code Section 954 connected together in their commission that would attach counts two -- both cases two and case three.

19

"But looking at the [Evidence Code section] 352 considerations, some of the factors that the Court has examined include the fact that are some of the charges more likely to inflame the jury than the other[s]. Looking at them on the balance, the Court answers that no, it does not appear that some are more prejudicial or inflammatory, that -- that it would prejudice the alleged weaker case.

"Secondly, are the People attempting to join a weak case with a stronger case to bolster the weak case? The defense has indicated that case number one is the stronger case. Looking at this as a two-witness, he said/she said, but as the Court indicated, because of [Evidence Code section] 1109, it would not be a he said/she said two witness, there would be multiple people testifying as to 1109 evidence. So it would be much more than that. So it does not appear to be attaching a strong case to bolster a weak case.

"Third, is this a situation where one of the charges is a capital offense[?] The answer to that is no.

"So balancing the prejudice and the probative value, it does not appear under [Evidence Code section] 352 that the Court should separate and sever cases one, two, or three from being tried together.

"And, finally, is this a situation where there would be a gross unfairness amounting to a denial of due process[?] [Citation.] It does not appear to be such a situation. [¶] Therefore, based on all of these reasons, the motion will be denied."

B. *Guiding Principles*

Section 954 provides in part: "An accusatory pleading may charge two or more different offenses connected together in their commission, or . . . of the same class of crimes or offenses . . . . [P]rovided, that the court in which a case is triable, in the

interests of justice and for good cause shown, may in its discretion order that the different offenses or counts set forth in the accusatory pleading be tried separately or divided into two or more groups and each of said groups tried separately."

"For purposes of joinder, offenses are deemed to have been 'connected together in their commission' where there was a common element of substantial importance in their commission, even though the offenses charged did not relate to the same transaction and were committed at different times and places and against different victims. [Citations.] Similarly, within the meaning of section 954, offenses are 'of the same class' if they possess common characteristics or attributes." (*Aydelott v. Superior Court* (1970) 7 Cal.App.3d 718, 722; see *People v. Lucky* (1988) 45 Cal.3d 259, 276.)

The law prefers consolidation or joinder of charged offenses in the interests of judicial economy (*Alcala v. Superior Court* (2008) 43 Cal.4th 1205, 1220), and the language of section 954 shows legislative intent for a "very broad test for joinder" (*id.* at p. 1217). Indeed, the joinder of related charges, "'whether in a single accusatory pleading or by consolidation of several accusatory pleadings, ordinarily avoids needless harassment of the defendant and the waste of public funds which may result if the same general facts were to be tried in two or more separate trials [citation], and in several respects separate trials would result in the same factual issues being presented in both trials.'" (*People v. Ochoa* (1998) 19 Cal.4th 353, 409; see *Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1220 [noting that "because consolidation or joinder of charged offenses ordinarily promotes efficiency, that is the course of action preferred by the law"].)

C. *Analysis*

1. *Severance of Mendez Counts and Jessica G. Counts*

Defendant admits both the Mendez counts and the Jessica G. counts involved domestic violence.  This concession alone shows their joinder was proper.  However, even without the concession, we have little difficulty concluding the trial court properly exercised its discretion (see *People v. Marshall* (1997) 15 Cal.4th 1, 27-28) in refusing to sever the Mendez counts and the Jessica G. counts because the record contains ample evidence supporting the finding that both the Mendez counts and the Jessica G. counts were of the "same class of crimes or offenses" under section 954.  That is, both the Mendez counts and the Jessica G. counts involved domestic violence, the subsequent violation of a domestic violence restraining order and false imprisonment of a domestic violence victim.  Because both the Mendez counts and the Jessica G. counts possessed common characteristics and attributes, their joinder was proper.  (See *Alcala v. Superior Court*, *supra*, 43 Cal.4th at p. 1220; *Aydelott v. Superior Court*, *supra*, 7 Cal.App.3d at p. 722.)

Once criminal charges are properly joined, as in the instant case, the "'burden is on the party seeking severance to clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'"  (*People v. Soper* (2009) 45 Cal.4th 759, 773.)  To meet this burden, a defendant must show the ruling fell "'"'"outside the bounds of reason.'"'"'"  (*Id.* at p. 774.)

"In determining whether a trial court abused its discretion under section 954 in declining to sever properly joined charges, 'we consider the record before the trial court when it made its ruling'" and focus on "'certain criteria [that] have emerged to provide

22

guidance in ruling upon and reviewing a motion to sever trial.'" (*People v. Soper*, *supra*, 45 Cal.4th at p. 774.)

"First, we consider the cross-admissibility of the evidence in hypothetical separate trials. [Citation.] If the evidence underlying the charges in question would be cross-admissible, that factor alone is normally sufficient to dispel any suggestion of prejudice and to justify a trial court's refusal to sever properly joined charges." (*People v. Soper*, *supra*, 45 Cal.4th at pp. 774-775.)

Here, defendant wisely has conceded that the Mendez counts and the Jessica G. counts were cross-admissible pursuant to Evidence Code section 1109, subdivision (a)(1), which provides (with exceptions not relevant here): "[I]n a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352."

He nonetheless contends he made a "clear showing of potential prejudice" (*People v. Sandoval* (1992) 4 Cal.4th 155, 172) to warrant severance because: (1) the counts and facts surrounding Mendez allegedly were far more serious than those surrounding Jessica G., thus causing the jury to become inflamed against defendant; and (2) the evidence related to both sets of counts allegedly was relatively weak, and, thus, the cases were brought together for their collective strength.

Regarding defendant's first contention, we disagree the Mendez counts were more serious, much less "far more serious" as he posits, than the Jessica G. counts such that joinder was likely to inflame the jury against him. The evidence in the record shows in both the Mendez counts and the Jessica G. counts defendant repeatedly physically abused

23

the victims, including pushing them against the wall, choking them and striking them after he had become angry. The record also shows neither Mendez nor Jessica G. sustained serious injury from the abuse, a fact which further supports a finding there was no prejudice, much less a "clear showing of potential prejudice" (see *People v. Sandoval*, *supra*, 4 Cal.4th at p. 172) absent joinder.

We also reject defendant's contention he established the requisite prejudice because the evidence related to *both* the Mendez counts and the Jessica G. counts was relatively weak, and, thus, the cases were brought together for their collective strength.[6] As already noted, both Mendez and Jessica G. were victims of domestic violence by defendant; both were set to testify and did testify about defendant's multiple acts of domestic violence against them that possessed common characteristics; and both escaped serious injury as a result of the acts of violence by defendant. As such, we reject this contention.

"In any event, as between any two charges, it always is possible to point to individual aspects of one case and argue that one is stronger than the other. A mere imbalance in the evidence, however, will not indicate a risk of prejudicial 'spillover effect,' militating against the benefits of joinder and warranting severance of properly joined charges. [Citation.] Furthermore, the benefits of joinder are not outweighed—and severance is not required—merely because properly joined charges might make it more

---

6    We note that defendant presented this issue somewhat differently in the trial court, when he argued that trying the Mendez counts and the Jessica G. counts together would substantially prejudice him because the evidence in support of the Jessica G. counts allegedly "was so minimal that it could not exist independently of the 2007 case" involving Mendez.

difficult for a defendant to avoid conviction compared with his or her chances were the charges to be separately tried. [Citation.]" (*People v. Soper*, *supra*, 45 Cal.4th at p. 781.)

Because defendant has been unable to establish the requisite "clear showing of potential prejudice" required to sever properly joined charges (see *People v. Sandoval*, *supra*, 4 Cal.4th at p. 172) and because the benefits of joinder clearly outweighed any alleged potential prejudice to him (see *People v. Soper*, *supra*, 45 Cal.4th at p. 783), we have little difficulty concluding on this record that the court properly exercised its discretion in denying defendant's motion to sever the Mendez counts and the Jessica G. counts.

2. *Severance of Mendez/Jessica G. Counts and Impersonation/Child Endangerment Counts*

Defendant also contends the court abused its discretion and thus erred when it refused to sever the Mendez counts and the Jessica G. counts (sometimes hereafter domestic violence counts), on the one hand, from the impersonation/child endangerment counts, on the other hand.

The record shows that throughout their approximate 10-month relationship, defendant repeatedly represented to Jessica G. and her daughter Kylie that he possessed the power and authority of a sworn police officer. It was this *same* power and authority defendant exercised when he repeatedly stopped and/or detained others as charged in the impersonation counts, including in count 8 when defendant, in front of Kylie, detained Figueroa at Kylie's school. Because of the overlap of witnesses in the Jessica G. counts and the impersonation/child endangerment counts and because in those counts

defendant's abuse of authority was at issue, we conclude the court properly exercised its discretion when it found these counts were properly joined for purposes of section 954.

Having concluded joinder was proper, as noted *ante*, the burden shifted to defendant to "'clearly establish that there is a substantial danger of prejudice requiring that the charges be separately tried.'" (See *People v. Sandoval*, *supra*, 4 Cal.4th at p. 172.) Defendant has not met this burden.

Here, the evidence regarding defendant's repeated representations to Jessica G. and Kylie that he had the same power and authority as a police officer, even when separately confronted by Jessica G. and Kylie on this very issue, was clearly admissible in the impersonation counts. Moreover, evidence that defendant was restraining and detaining others and holding himself out to be something that he was not (i.e., a police officer) was also admissible in connection with the Jessica G. counts, where defendant also held himself out to Jessica G. to be something that he was not (i.e., a police officer and a mercenary on his way overseas to participate in a dangerous mission that could result in him being "KIA").

In addition, the record shows Jessica G.'s daughter Kylie was a passenger in defendant's car in several instances when defendant pulled over motorists or otherwise exercised his alleged authority as a sworn police officer. What's more, Kylie was involved in and/or witnessed various incidents relevant to the Jessica G. counts including, by way of example only, the incident involving Figueroa in count 8, and the incident when Kylie believed defendant came to their home while her mother was at work and, in violation of a restraining order, knocked on the back door and "jiggled" the front door.

Defendant nonetheless contends he made the requisite clear showing of potential prejudice to warrant severance of the domestic violence counts from the impersonation/child endangerment counts because "[w]ithout the evidence related to Ms. Mendez and Ms. [G.], [defendant] would appear as an overzealous citizen who broke the law." However, as a result of the evidence from the domestic violence counts, defendant contends he allegedly was viewed as someone "sinister, controlling and power hungry," which thus inflamed the jury against him.

However, even absent evidence from the domestic violence counts, there is ample evidence in the record to show defendant was—using his own words—"sinister, controlling and power hungry" in connection with the impersonation counts, thus defusing his contention the jury was inflamed against him as a result of joinder of the domestic violence counts.

By way of example only, defendant did not appear to be merely an "overzealous citizen who broke the law" in connection with count 22. In this incident, he told Kylie to "'watch this.'" He then slowed down his car while driving on a freeway and, over the loudspeaker, told a *homeless* man to "'get off of my freeway.'" Defendant scared the homeless man, which appears in part to have been his motivation, and then offered to buy the man a pizza if he picked up *trash* along the freeway. This incident and others (i.e., count 8 involving Figueroa or count 10 involving Fernandez and Ballesteros) support a finding the jury was not unduly inflamed against defendant, as he contends, because the domestic violence counts were joined with the impersonation/child endangerment counts.

27

## II

## Substitution of Counsel

Defendant next contends the trial court abused its discretion when, after *seven* earlier continuances, it denied his request on the date trial was to begin to substitute in new counsel who was unfamiliar with defendant's case.

A. *Additional Background*

The record shows defendant was indicted by the grand jury in mid-May 2011. In late June 2011, public defender Jesus Romero was appointed to represent defendant. On October 12, 2011, the day trial was set to begin, defendant sought and obtained a trial continuance to March 5, 2012. Thereafter, trial was continued to March 12, 2012.

On March 8, 2012, the court granted defendant's request to represent himself after it denied his request for new counsel pursuant to *People v. Marsden* (1970) 2 Cal.3d 118. Trial was then set for June 20, 2012. However, on May 24, 2012, the record shows the court continued defendant's trial to September 10, 2012. In so doing, the court found that there was nothing "specific about contact with people or potential witnesses that would cause [the court] to believe that [defendant] need[ed] a continuance" and that, when the court previously granted defendant's request to represent himself, it informed him to be ready for trial. The record shows the court nonetheless granted defendant's request for a continuance, noting it would be the *last*.

The record shows defendant on August 7, 2012 requested reappointment of a public defender. The court granted that request, reappointed Romero to represent defendant and subsequently granted defendant's request to continue the trial to October 22, 2012.

On October 22, 2012, attorney Mark Edelman specially appeared on behalf of defendant, requesting he be substituted in as defendant's new counsel. Edelman explained to the court that on October 18, 2012, he had viewed an ad on the internet posted by defendant's friend seeking an attorney to handle defendant's trial. Edelman noted he had been misinformed that defendant was then representing himself and that there had been no prior continuances in the case, when in fact defendant's trial had been continued at least seven times.

If appointed, Edelman estimated he could be ready to start trial the last week of November 2012. However, after learning the number of proposed witnesses the People intended to call, Edelman revised that estimate during the hearing and said he "maybe" would be ready to start trial in the middle of December.

In denying defendant's motion to substitute in new counsel, the trial court looked at the history of the case and found that *if* Edelman was appointed, there would be a "great disruption or delay"[7] as a result of "new counsel coming up to speed," as Edelman "would not be ready until *possibly* mid December" (italics added) given the complexity

---

[7]     In making its ruling, the trial court cited *People v. Windham* (1977) 19 Cal.3d 121, which defendant correctly notes is a case involving a defendant's right to self-representation. We note, however, the trial court in its analysis of this issue subsequently applied the proper law (i.e., whether substitution would cause an unreasonable disruption in the proceedings and/or unreasonable delay), as discussed *post.* In any event, it is axiomatic that we may sustain a trial court's decision without necessarily embracing its reasoning. (See, e.g., *People v. Smithey* (1999) 20 Cal.4th 936, 971-972 [noting the general rule that a """'ruling or decision, itself correct in law, will not be disturbed on appeal merely because given for a wrong reason,'""" and further noting that """[i]f right upon any theory of the law applicable to the case, it must be sustained regardless of the considerations which may have moved the trial court to its conclusion'""].)

of the case; and that, unlike Edelman, Romero and the People were prepared to start trial that day.

In addition, the court noted that defendant's refusal to cooperate with Romero or make a good faith effort to resolve any potential disagreements with him was not a basis to substitute in Edelman as defendant's counsel. In this regard, Romero noted at the hearing that defendant was choosing not to communicate with him; that defendant had asked him to do things that were "illegal in nature"; and that defendant surmised Romero was "complicit" with the district attorney's office and was "working against him." Romero also indicated that in the past few weeks he had received sporadic phone calls from lawyers responding to the internet ad placed by defendant's friend.

The record further shows that after the trial court refused to substitute Edelman as defendant's counsel, at defendant's request it conducted a *People v. Marsden* hearing and ultimately refused to remove Romero as defendant's counsel and appoint new counsel.[8]

B. *Guiding Principles*

A defendant "who does not require appointed counsel" has the right under the Sixth Amendment "to choose who will represent him [or her]." (*United States v. Gonzalez-Lopez* (2006) 548 U.S. 140, 144.) That right, however, is "not absolute" (*People v. Verdugo* (2010) 50 Cal.4th 263, 311) and "can be forced to yield if the court determines the appointment at issue will result 'in a disruption of the orderly processes of justice unreasonable under the circumstances of the particular case.' [Citations.] A trial

---

8 Defendant has not challenged on appeal the court's denial of this particular request or his *other* requests for removal of appointed counsel pursuant to *People v. Marsden*, *supra*, 2 Cal.3d 118.

court has 'wide latitude in balancing the right to counsel of choice against the needs of fairness [citation] and against the demands of its calendar [citation]. The court has, moreover, an "independent interest in ensuring that criminal trials are conducted within the ethical standards of the profession and that legal proceedings appear fair to all who observe them." [Citation.]' (*United States v. Gonzalez–Lopez*[, *supra*,] 548 U.S. [at p.] 152.)" (*People v. Alexander* (2010) 49 Cal.4th 846, 872.) A "'disruption of the orderly processes of justice'" may result from a defendant's untimely request to discharge counsel. (See *People v. Ortiz* (1990) 51 Cal.3d 975, 983.)

C. *Analysis*

Here, the record shows that when Edelman specially appeared on October 22 after first seeing the internet ad on October 18, 2012, he had virtually no information concerning defendant's case, which, as suggested by our discussion *ante* concerning severance, involved multiple counts and multiple witnesses spanning the course of years. During the course of the October 22, 2012 hearing, the record shows Edelman already had revised his forecast of when he *possibly* could be ready to start trial, stating initially he could be ready at the end of November 2012 but then subsequently revising that estimate to mid-December, "maybe."

In addition, as Edelman himself recognized, he had been given improper information prior to the hearing, inasmuch as the record shows the trial already had been continued at least seven times, even after the court warned there would be no further continuances. What's more, the record also shows defendant already had been afforded previous opportunities to change representation, including close to or on the eve of trial (with accompanying delays in the start of trial).

31

Under these circumstances, we conclude the court properly exercised its discretion when it found defendant's eleventh-hour request to substitute in new counsel would have adverse effects on the orderly administration of justice, as it would have prompted yet another delay of trial of *at least* close to two months—and likely much longer, given the complexity of the case and given Edelman had virtually no familiarity with the case when he was making (and already revising during the *same* hearing) his estimate of when he could be ready. (See *People v. Verdugo*, *supra*, 50 Cal.4th at p. 311 [concluding the trial court acted within its discretion in denying the defendant's motion to relieve counsel during an evidentiary hearing on the defendant's new trial motion because new counsel not only would have to become familiar with the specific issues raised in such motion but also would have had to study the "entire lengthy trial record, resulting in significant delays"]; see also *People v. Keshishian* (2008) 162 Cal.App.4th 425, 429 [concluding the trial court properly rejected the defendant's attempt to discharge counsel and delay the start of trial when that request was made on the date trial was set to begin].)

III

Alleged Prosecutorial Misconduct

Defendant next contends the prosecutor engaged in misconduct that violated his federal and state constitutional rights to due process and a fair trial by referencing the grand jury on four separate occasions during defendant's lengthy trial, in contravention of the trial court's in limine order.

A. *Additional Background*

Before trial, the court indicated it intended to use the term "indictment" in voir dire and at trial, inasmuch as the grand jury had indicted defendant. The defense objected,

32

stating the use of the terms "grand jury" or "indictment" suggested a "trained body" already had "passed judgment" on defendant. In response, the prosecutor stated he would refer to the grand jury and/or the indictment as a "'prior court proceeding.'"

The record shows the parties next discussed how they were to refer to the various counts in the verdict forms, inasmuch as defendant was charged by indictment. Ultimately, the court and the parties agreed to remove the word "indictment" from the verdict forms. In so doing, the court stated it was leaning toward using the words "charging documents" in lieu of indictment so that neither the words "grand jury" nor "indictment" would be mentioned, but it nonetheless asked defense counsel for "some authority" on this issue.

The record shows during the redirect of a prosecution witness, in an attempt to refresh the witness's memory, the prosecutor asked the witness whether he had spoken to a police detective one month "prior to the grand jury." After the defense's objection was sustained and the statement was stricken, the defense, outside the presence of the jury, moved for a mistrial.

In response, the prosecutor stated his reference to the grand jury was a "slip of the tongue" and apologized. The prosecutor suggested the court give a curative instruction and noted there was "nothing prejudicial about the fact that a grand jury, at some point, heard testimony. The jury can simply be told, if the court feels it is necessary, that a grand jury heard testimony in this matter. A grand jury has a different standard of proof, and you are not to draw any inference or draw any conclusion from the fact that there was a prior proceeding in this matter."

The court agreed the reference to "grand jury" was unintentional, denied the motion for mistrial and offered to admonish the jury either then or at the end of the trial. The defense refused the court's offer to admonish the jury, noting it would just draw more attention to the issue.

The next day, the prosecutor again mentioned the grand jury in passing as he was attempting to refresh a witness's recollection. The record shows before doing so, the prosecutor referred to the testimony previously given by the witness (before the grand jury) as a "prior proceeding." There was no objection by the defense to the grand jury reference, and the court did not sua sponte strike the reference.

The record shows the prosecutor again referenced the grand jury the next day after again trying to refresh a witness's recollection (i.e., Mendez) of prior testimony. On this occasion, defense counsel objected to the reference. During a side bar, the record shows the prosecutor initially thought the defense's objection had to do with his attempts to refresh the witness's recollection, in contrast to his grand jury reference. After the defense again moved for a mistrial, the prosecutor once more apologized, stated the grand jury reference was an accident as he was using the grand jury transcripts during the trial, and again suggested the court give the jury a curative instruction.

The court admonished the prosecutor to be careful with his words, and the defense again rejected the court's offer to give the jury a curative instruction. The court reminded the prosecutor that "slips of the tongue cannot be occurring," as the grand jury reference contradicted the court's ruling in limine, and that the more they occurred, the "more we get to a situation where there may have to be more sanctions."

34

Finally, the record shows the prosecutor mentioned the grand jury again in passing when asking a witness (i.e., Mendez) whether she had been encouraged to tell the truth at trial even *if* she had lied to the grand jury. The record shows before the prosecutor referenced the grand jury, he once more referred to it as a "prior proceeding." The record shows the defense did not move to strike the grand jury reference, and the court did not do so on its own motion.

In response to defendant's new trial motion where this issue was raised, the prosecutor noted the grand jury references were inadvertent and were the result of "habit from the standard process of impeaching testimony during lengthy trial days where witness after witness had trouble remembering testimony from over a year and a half prior."

B. *Guiding Principles*

It is misconduct for a prosecutor to violate a court ruling by eliciting or attempting to elicit inadmissible evidence. (*People v. Silva* (2001) 25 Cal.4th 345, 373.) Nonetheless, a defendant's conviction will not be reversed for prosecutorial misconduct unless it is reasonably probable that a result more favorable to the defendant would have been reached without the alleged misconduct. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1133; see *People v. Watson* (1956) 46 Cal.2d 818, 836.)

We review the court's ruling on a motion for mistrial based on alleged prosecutorial misconduct for an abuse of discretion. (*People v. Ayala* (2000) 23 Cal.4th 225, 283.) "A motion for mistrial is directed to the sound discretion of the trial court. We have explained that '[a] mistrial should be granted if the court is apprised of prejudice that it judges incurable by admonition or instruction. [Citation.] Whether a particular

35

incident is incurably prejudicial is by its nature a speculative matter, and the trial court is vested with considerable discretion in ruling on mistrial motions.' [Citation.]" (*People v. Jenkins* (2000) 22 Cal.4th 900, 985-986.)

C. *Analysis*

We conclude the trial court properly exercised its discretion when it refused to grant a mistrial based on the alleged prosecutorial misconduct in this case. The trial court found, as borne out by the record, that the grand jury references (when an objection was lodged) were inadvertent and unintentional, a finding that is amply supported by the evidence in the record. Indeed, the record shows the grand jury references by the prosecutor occurred in passing and ostensibly unknowingly when he was attempting to refresh various witnesses' recollection of their prior testimony before the *grand jury*.

In addition, although the court—at the request of the defense—ruled in limine there should be no reference to an "indictment" or the "grand jury," as demonstrated by the record the court also asked the defense to provide legal authority to support that ruling. In our own review of the voluminous record, it appears no such authority was ever provided. In any event, we were unable to locate independently any authority that referencing the grand jury under circumstances such as here, where a defendant has been charged by indictment, deprives a defendant of the right to a fair trial.

We thus conclude the court properly exercised its discretion in denying defendant's request for a mistrial, after it offered to give what we conclude was a simple curative instruction, because there was no prosecutorial misconduct in this case. (Cf. *People v. Duff* (2014) 58 Cal.4th 527, 568 [noting a "'prosecutor commits misconduct when his or her conduct either infects the trial with such unfairness as to render the

subsequent conviction a denial of due process, or involves deceptive or reprehensible methods employed to persuade the trier of fact'"]; *People v. Hudson* (1981) 126 Cal.App.3d 733, 735-736 [reversing defendant's conviction for rape and forcible oral copulation because he was deprived of the right to fair trial when the prosecutor "resorted to inflammatory rhetoric, violated the trial court's rulings, brought out inadmissible matters in the guise of questions and statements, used extremely vulgar forms of argumentative questions and injected prejudicial innuendo by his editorial comments in front of the jury," including, by way of example only, referring on cross-examination to defendant's penis as a "little bugger," making the immaterial point that the defendant hung out a donut shop to be close to prostitutes and purposely referencing defendant's inadmissible confession]; see also *People v. Avila* (2006) 38 Cal.4th 491, 573 [noting a "trial court should grant a motion for mistrial 'only when "'a party's chances of receiving a fair trial have been irreparably damaged'"' [citation], that is, if it is 'apprised of prejudice that it judges incurable by admonition or instruction'"].)[9]

Moreover, even assuming there was misconduct, we conclude it was not prejudicial. As shown by the record, on two occasions neither the court nor the parties even caught the prosecutor's passing reference to "grand jury," which, as noted, was

_____

[9]     In light of our conclusion there was no prosecutorial misconduct in this case, we also reject defendant's contention he was denied effective assistance of counsel by his counsel's failure to object to two of the four grand jury references by the prosecutor. (See *People v. Hernandez* (2004) 33 Cal.4th 1040, 1052–1053 [noting to establish ineffective assistance, a defendant must show: (1) counsel's performance fell below an objective standard of reasonableness under prevailing professional norms, and (2) it is reasonably probable that the verdict would have been more favorable absent counsel's error]; see also *People v. Cudjo* (1993) 6 Cal.4th 585, 616 [noting absent a sound legal basis for objection, counsel's failure to object to the admission of evidence cannot establish ineffective assistance of counsel].)

37

harmless and, in our view, merely an inadvertent "slip of the tongue."  (See *People v. Duff*, *supra*, 58 Cal.4th at p. 568 [noting a "defendant asserting prosecutorial misconduct must further establish a reasonable likelihood the jury construed the remarks in an objectionable fashion"].)

That the jury found defendant not guilty of eight counts also supports the finding the jury gave little or no weight to the fact defendant had been indicted by a grand jury. This finding is also supported by the trial court's clear jury instructions that it was up to the jury and the jury "alone to decide what happened, based only on the evidence that has been presented"; that "[n]othing the attorneys say is evidence"; and that, if the court sustained an objection, it was to ignore the question.  For this separate and independent reason, we conclude defendant cannot show he was prejudiced by the four grand jury references even assuming those references involved prosecutorial misconduct.

## DISPOSITION

The judgment of conviction is affirmed.


BENKE, Acting P. J.

WE CONCUR:


HUFFMAN, J.


AARON, J.